United States of America v. City of Madison, Florida;
Madison County, Florida; and ITT LLC

Proposed Consent Decree

Appendix B: Amended Record of Decision

# AMENDED RECORD OF DECISION FOR GROUNDWATER AND SUMMARY OF REMEDIAL ALTERNATIVE SELECTION

## MADISON COUNTY SANITARY LANDFILL SUPERFUND SITE

### MADISON, MADISON COUNTY, FLORIDA

**PREPARED BY:**

**U.S. ENVIRONMENTAL PROTECTION AGENCY**
**REGION 4**
**ATLANTA, GA**

**SEPTEMBER 2022**

Chaffins, Randall Digitally signed by Chaffins, Randall Date: 2022.09.09 10:16:28 -04'00'

---------------------------------- ----------------------------------

Carol J. Monell, Director
Superfund & Emergency Management Division

Date

This page intentionally left blank

**Table of Contents**

**I. INTRODUCTION AND STATEMENT OF PURPOSE ... 4**
A. Site Name and Location ... 4
B. Statement of Basis and Purpose ... 4
C. Assessment of the Site ... 5
D. Description of the Amended Remedy ... 5
E. Statutory Determinations ... 6
F. Authorizing Signatures ... 6
**II. DECISION SUMMARY ... 7**
1.0 Site Name, Location and Description ... 7
2.0 Site History, Contamination and Selected Remedy ... 7
2.1 Site History of Contamination ... 7
2.2 Previous Response Actions ... 7
2.3 Selected Remedy from 1992 ROD ... 9
2.4 Implementation of 1992 ROD Selected Remedy ... 11
3.0 Basis for Taking Action ... 12
3.1 Shutdown of the Pump-and-Treat System ... 12
3.2 Further Investigations of Groundwater Treatment Technologies ... 12
3.3 YTA Investigations/Conceptual Site Model ... 13
3.4 ERD Pilot Study ... 15
4.0 Description of Proposed Alternatives ... 18
5.0 Comparative Analysis of Alternatives ... 19
5.1 Overall Protection of Human Health and the Environment ... 20
5.2 Compliance with ARARs ... 20
5.3 Long-term Effectiveness and Permanence ... 21
5.4 Reduction of Toxicity, Mobility, or Volume Through Treatment ... 21
5.5 Short-term Effectiveness ... 21
5.6 Implementability ... 22
5.7 Cost ... 22
5.8 State Acceptance ... 23
5.9 Community Acceptance ... 23
6.0 Selected Amended Remedy ... 23
6.1 Summary of the Rationale for the Selected Amended Remedy ... 23
6.2 Description of the Selected Amended Remedy ... 24

6.3 Implemented Institutional Controls ........ 25
6.4 Key Chemical-Specific ARARs ........ 26
6.5 Estimated Cost of the Selected Amended Remedy ........ 28
6.6 Estimated Outcomes of the Selected Amended Remedy ........ 28
7.0 State Acceptance ........ 28
8.0 Statutory Determinations ........ 28
8.1 Protection of Human Health and the Environment ........ 29
8.2 Compliance with ARARs ........ 29
8.3 Cost-Effectiveness ........ 29
8.4. Utilization of Permanent Solutions and Alternative Treatment Technologies to the Maximum Extent Practicable ........ 30
8.5. Five-Year Review Requirements ........ 30
9.0 Public Participation Compliance ........ 30

**TABLES**

Table 1: Contaminants of Concern (COCs), by Media
Table 2: Groundwater COC Cleanup Goals from 1992 ROD
Table 3: 1,4-Dioxane Concentrations and General Trends in Newer Wells
Table 4: TCE and Degradation Product Concentration Trends (2016-2019)
Table 5: Summary of Implemented Institutional Controls (ICs)
Table 6: Previous and Current ARARs for Groundwater COCs
Table 7: Cost Estimate Breakdown of Alternative 3/Newly Selected Alternative

**FIGURES**

Figure 1: Site Vicinity
Figure 2: Current Monitoring Well Network
Figure 3: 1,4-Dioxane Trends in the YTA in Older Wells
Figure 4: Geologic and CVOC Distribution Cross Section A-A' Northwest Corner of YTA
Figure 5: Northwest Corner Contaminate Isocontour
Figure 6: Geologic and CVOC Distribution Cross Section B-B' Southeast Corner of YTA
Figure 7: Southeast Corner Contaminate Isocontour
Figure 8: Southwest Corner Contaminate Isocontour
Figure 9: Northwest Corner Alternative 2 and Alternative 3 Treatment Area
Figure 10: Southeast Corner Alternative 2 and Alternative 3 Treatment Area
Figure 11: Southwest Corner Alternative 2 and Alternative 3 Treatment Area
Figure 12: Institutional Control and Groundwater CVOC Plume Map

**APPENDICIES**

Appendix A: Administrative Record Index
Appendix B: City and County Ordinances
Appendix C: Land Use Restrictions
Appendix D: FDEP Comments on ROD Amendment
Appendix E: Estimated CVOC Cleanup Time
Appendix F: ARARs Tables

# I. INTRODUCTION AND STATEMENT OF PURPOSE

## A. Site Name and Location

The Madison County Sanitary Landfill Superfund Site ("the Site" or "the MCSL Site") is located on Northeast Rocky Ford Road (County Road 591), approximately two miles north-northeast of the City of Madison, in Madison County, Florida. The Site encompasses approximately 90 acres on a single 133-acre parcel (tax parcel identification number: 11-1N-09-3486-001-000), which is owned by Madison County. In 1970, the City of Madison opened a sanitary landfill at the Site, which accepted domestic as well as industrial wastes from the city and surrounding areas. Madison County assumed ownership of the Site in 1980. The location of the Site as well as the Site layout are shown in Figure 1. The National Superfund Database Identification Number is FLD981019235.

## B. Statement of Basis and Purpose

This Record of Decision (ROD) Amendment selects a modification ("Amended Remedy" or "Remedy Modification") to the groundwater remedy selected for the Site by the U.S. Environmental Protection Agency in the initial ROD signed September 28, 1992 (1992 AROD). The 1992 ROD addressed both contaminated groundwater and landfill waste; however, the remedy for contaminated landfill waste continues to function as intended, and therefore no changes to that portion of the remedy will be made in part of this ROD Amendment. This ROD Amendment explains the factual and legal bases for amending the selected groundwater remedy.

The Amended Remedy was chosen in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, also commonly referred to as "Superfund"), 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), and, to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. Part 300 et seq., as amended. This ROD Amendment serves as the final action for groundwater at the Site.

This document is issued by the EPA, the lead agency for Site activities. The Florida Department of Environmental Protection (FDEP), the support agency, concurs with this amended remedy. The information supporting the EPA's decision on the amended remedy is contained in the Admirative Record (AR) file for the Site, which has been developed in accordance with Section 113(k) of CERCLA, 42 U.S.C. § 9613(k), and the NCP at 40 C.F.R. § 300.825(a)(2). The Administrative Record for the Site is available for review by the public at the North Florida College Library, located at 325 NW Turner Davis Drive, Madison, Florida. At the time of this publication, the hours of operation for the North Florida College Library are Monday through Thursday from 8 a.m. to 7 p.m. EST and Friday from 8 a.m. to 4:30 p.m. EST. Additionally, the AR for the Site can be found on the Madison County Sanitary Landfill Site Profile Page at https://semspub.epa.gov/src/collection/04/AR67060. The AR Index identifies each of the items comprising the Administrative Record upon which this ROD Amendment is based and can be found in Appendix A.

### C. Assessment of the Site

The response action selected in this ROD Amendment is necessary to protect public health or welfare of the environment from actual or threatened releases of hazardous substances or pollutants or contaminants from this Site that may present an imminent and substantial endangerment to public health or welfare.

### D. Description of the Amended Remedy

The remedy selected to address the source of soil contamination (landfill waste) in the 1992 ROD continues to function as intended, and institutional controls (ICs) in the form of land-use restrictions and local ordinances are in place. However, the groundwater pump-and-treat system, the remedy selected in the 1992 ROD to treat contaminated groundwater, has not been in operation since it was shut down in December 2010 by the potentially responsible parties (PRPs) after detecting 1,4-dioxane in the air stripper effluent above the Florida groundwater cleanup target level (GCTL). The detection of 1,4-dioxane prompted an evaluation of remedial alternatives that would address the existing contaminants of concern (COCs), which are multiple chlorinated volatile organic compound (CVOCs) as well as 1,4-dioxane.

This ROD Amendment modifies the groundwater remedy for the Site from pump-and-treat to a phased remedy including enhanced reductive dechlorination (ERD) with supplemental amendments and in-situ chemical oxidation (ISCO) hotspot treatment. It also adds 1,4-dioxane as a COC in groundwater along with a specified cleanup level.

ERD is a type of enhanced in-situ bioremediation technology used to promote anaerobic biological dechlorination of chlorinated solvents in the subsurface by accelerating the natural biodegradation process. This is achieved through injections of a carbon source, nutrients, and electron donors into the groundwater to enhance the rapid conversion of chlorinated volatile organic compound (CVOC) contaminants to innocuous byproducts.

In-situ chemical oxidation utilizes chemical reactions formed by adding an oxidant to the source area of contaminated groundwater to destroy the contaminants and produce a byproduct that is less toxic or non-hazardous.

The remedial action objectives (RAOs) for this amended remedy are the same as they were for the pump-and-treat remedy identified in the 1992 ROD. The RAOs related to groundwater are as follows:

- Prevent the near-term and future exposure of human receptors to contaminated groundwater both on and off the Site.
- Minimize the migration of contamination from the landfill to the surrounding community.
- Restore the groundwater to drinking water quality for the Contaminants of Concern (COCs).
- Monitor groundwater in a manner that will verify the effectiveness of the selected remedy.

## E. Statutory Determinations

The amended remedy meets the mandates of CERCLA § 121 and is consistent with the regulatory requirements of the NCP. The amended remedy is protective of human health and the environment, complies with identified Federal and more stringent State cleanup standards that are applicable or relevant and appropriate requirements (ARARs) to the remedial action, is cost effective, and utilizes a permanent solution to the maximum extent practicable.

The amended remedy also satisfies the statutory preference for treatment as a principal element of the remedy (i.e., reduction of the toxicity, mobility, or volume of hazardous substances) through use of in-situ treatment of CVOCs and 1,4-dioxane in the groundwater.

Due to the Site remedies resulting in hazardous substances, pollutants or contaminants remaining on-Site above levels that allow for unlimited use and unrestricted exposure (UU/UE), Site-wide statutory five-year reviews pursuant to CERCLA section 121(c) is necessary to ensure that the remedy continues to be protective of human health and the environment. The EPA a conducted five-year review (FYR) at the Site in 2000, 2005, 2010, 2015 and 2020. The most recent FYR was completed on September 21, 2020.

## F. Authorizing Signatures

The ROD Amendment documents a fundamental change to the remedy selected in the September 1992 ROD. This amendment to the remedy was developed by the EPA, with concurrence from FDEP.
The Director of the Superfund & Emergency Management Division (EPA, Region 4) has been delegated the authority to approve this decision document.

# II. DECISION SUMMARY

## 1.0 Site Name, Location and Description

The Madison County Sanitary Landfill Superfund Site ("the Site" or "the MCSL Site") is a potentially responsible party (PRP)-lead Site and is located on Northeast Rocky Ford Road (County Road 591). It is approximately two miles north-northeast of the City of Madison, in Madison County, Florida. The Site consists of a parcel which encompasses approximately 90 acres of a 133-acre parcel (tax parcel identification number: 11-1N-09-3486-001-000) owned by Madison County. An approximately 9-acre former landfill to the southeast, commonly referred to as the Yard Trash Area (YTA), and the County Department of Transportation (DOT), a County Recycling Center, and the County's aviation and landing strip to the southwest, also occupy the parcel which makes up the Site. Not considered a part of the Site but occupying the same parcel are a closed Class I sanitary landfill and associated stormwater pond. These were previously addressed through a State-closure plan and are not addressed by the scope of remedial actions for the remainder of the parcel which makes up the Site. The location of the Site as well as the Site layout are shown in Figure 1. The National Superfund Database Identification Number for the Site is FLD981019235.

## 2.0 Site History, Contamination and Selected Remedy

### 2.1 Site History of Contamination

The City of Madison began operation of an unlined trench-and-fill style landfill at the Site in 1970. Trenches (cells) of varying lengths and widths, typically 50 feet by 30 feet and approximately 15 to 25 feet in depth, were used. Between 1971 and 1980, municipal/domestic and industrial wastes were disposed of in the trenches at the landfill and covered with excavated material.

Information compiled by the EPA suggested that ITT (formerly known as ITT Thompson) delivered an undetermined quantity of trash and liquid wastes to the landfill for disposal. At their nearby Thompson Industries facility, ITT used trichloroethylene (TCE) as an industrial solvent for cleaning painted wheel covers. ITT then distilled the used solvent and recovered TCE for reuse. The residual sludge was removed and disposed of in 55-gallon drums containing an undetermined quantity of waste, including polishing and buffer compounds used to polish automobiles. These drums were then crushed and disposed of in the YTA. ITT also disposed of acid wash water in the landfill from 1971 to 1974.

### 2.2 Previous Response Actions

In 1980, Madison County assumed operation of the landfill and contracted the Suwannee River Water Management District (SRWMD) in 1984 to install groundwater monitoring wells at the landfill. The results of sampling conducted between 1984 and 1985 revealed the presence of several volatile organic compounds (VOCs), including TCE and 1-2 dichloroethene (1-2 DCE), in both monitoring wells and private wells. ITT initially supplied bottled water and ice to the affected residences before replacing the provision with filtered well water and then eventually connecting all affected residences to City water lines. Two drum removal operations also took place between 1984 and 1985 within the northwest and southeast corners of the YTA. Approximately 40 drums were recovered as a result of the operation.

Based on the level of groundwater contamination, the EPA proposed the Site for listing on the Superfund program's National Priorities List (NPL) in June 1988 and finalized the Site on the NPL in August 1990. On June 11, 1990, the EPA entered into a Consent Order with ITT, Madison County, and the City of Madison, the Site PRPs, requiring completion of a remedial investigation and feasibility study (RI/FS). The PRPs began the RI/FS in December 1990, and the EPA approved the RI/FS Report in September 1992. During this period, in May 1992, FDEP ordered closure of the portion of the landfill actively used for waste disposal. A new regional landfill which serves the county was constructed at a different location in the northeastern area of Madison County.

Results from the Site's 1992 RI indicated that groundwater and soil had been contaminated by site-related compounds. Although many exposure pathways were considered, the primary exposure pathways identified and quantified in the Baseline Risk Assessment were associated with groundwater. The Human Health Risk Assessment evaluated human exposure to soil and groundwater and identified ingestion of groundwater as the exposure pathway that posed unacceptable risks.

The Baseline Risk Assessment determined potential, current, and future risks associated with dermal contact and ingestion of surface soils at the Site were below the lower limit of the acceptable risk range (below $10^{-6}$), thus a cleanup of this medium was not required. Additionally, the Risk Assessment determined that because there was no complete exposure pathway for chemicals in the subsurface soil, no risk was associated with this medium.

The RI also identified contaminant migration from landfill waste to groundwater. The contaminants contributing to the unacceptable risks are several chlorinated volatile organic compounds (CVOCs), as shown in Table 1. Sampling results indicated that the YTA is the primary source of groundwater contamination with CVOC concentrations exceeding state groundwater cleanup target levels (GCTLs) at F.A.C. 62-770 Table I and federal Safe Drinking Water Act (SDWA) maximum contaminant levels MCLs at 40 CFR 141.61.

The Ecological Risk Assessment concluded that no adverse environmental impacts on plant and animal life in the vicinity of the landfill had occurred as a result of the observed landfill contamination.

**Table 1: Contaminants of Concern (COCs), by Media**

| Media | COC |
|---|---|
| Landfill Waste and Groundwater | 1,1-Dichloroethane (1,1-DCA) |
| | 1,1-Dichloroethylene (1,1-DCE) |
| | Cis-1,2-dichloroethylene (cis-1,2-DCE) |
| | Trichloroethylene (TCE) |
| | Tetrachloroethylene (PCE) |
| | Vinyl chloride |
| | 1,1,1-trichloroethane |
| | 1,1,2-trichloroethane |
| | Di (2-ethylhexyl) phthalate |
| | Dichlorodifluoromethane |
| | Trichlorofluoromethane |

The 1992 Feasibility Study evaluated seven potential remedial alternatives to address contaminated soil and groundwater at the Site. Four of the alternatives were selected to undergo a more thorough and extensive analysis based on the advantages of their implementability, effectiveness, and cost. Those alternatives are listed as follows:

- *Alternative 1:* No Action

- *Alternative 3:* Institutional Actions, Extraction Wells, Air Stripping, Carbon Adsorption, and Reinjection

- *Alternative 6:* Institutional Actions, Cap 52 Acres, Extraction Wells, Air Stripping, Carbon Adsorption, and Reinjection

- *Alternative 7:* Institutional Actions, Cap YTA, Extraction Wells, Air Stripping, Carbon Adsorption, and Reinjection

Alternative 7 was selected in the Proposed Plan as the best course of action for source and groundwater contamination at the Madison County Landfill Site. The selected remedy would prevent current and future exposure to contaminated soils and groundwater through reduction of contaminant movement, isolation of waste materials, and restoration of the contaminated groundwater in the Floridan Aquifer beneath and downgradient of the Site.

### 2.3 Selected Remedy from 1992 ROD

The EPA issued the ROD for the Site on September 28, 1992. Based on the results of the RI/FS, the EPA determined that remediation of groundwater would be required for the protection of human health and the environment. The removal of known source material in the soil was conducted before the groundwater remedy was specified in the ROD. The 1992 ROD established several remedial action objectives (RAOs) for the YTA:

- Prevent the near-term and future exposure of human receptors to contaminated groundwater both on and off the Site.

- Minimize the migration of contamination from the landfill to the surrounding community.

- Restore the groundwater to drinking water quality for the COCs.

- Monitor groundwater in a manner that will verify the effectiveness of the selected remedy.

The remedial components of the selected remedy in the ROD include:

- Implementation of institutional controls by state and local government agencies, which would include deed restrictions, land use ordinances, physical barriers and water supply well permitting prohibitions.

- Construction of a groundwater extraction system, treatment by air stripping and granular activated carbon (GAC) and discharge by reinjection into the Floridan Aquifer in the vicinity of the YTA.

- Installation of a clay/soil cap over the YTA only.

- Contingent installation of a passive gas collection and control system.

- Construction of a stormwater management system.

- Implementation of an extensive groundwater monitoring program, including the installation of two additional monitoring well clusters.

- Long-term management controls, including operation and maintenance of the groundwater treatment system and the YTA cap.

For contaminated groundwater that is classified as an actual or potential drinking water source, the EPA expects restoration to achieve its beneficial use by attaining drinking water standards (e.g., Safe Drinking Water Act maximum contaminant levels (MCLs) or more stringent State standards (e.g. FDEP Groundwater CTLs at F.A.C. 62-777.170 Table I) throughout the plume(s). Though not clarified in the 1992 ROD for the Site, this ROD Amendment intends to specify that the EPA does not expect to achieve drinking water standards under the capped contaminated landfill waste which encompasses approximately 4.9 acres of the YTA (8.8 acres of the YTA is fenced). Consistent with the EPA groundwater policy for Superfund sites, groundwater beneath a capped waste management area does not require restoration to attain drinking water standards.

A summary of the ROD cleanup goals for groundwater is presented in Table 2.

**Table 2: Groundwater COC Cleanup Goals from 1992 ROD**

| Groundwater COC[a] | ROD Cleanup Goal (µg/L) |
|---|---|
| 1,1-DCA | 2,400[b] |
| 1,1-DCE | 7[c] |
| cis-1,2-DCE | 70[c] |
| TCE | 3[c] |
| PCE | 3[c] |
| Vinyl chloride | 1[c] |
| 1,1,1-Trichloroethane | 200[b] |
| 1,1,2-Trichloroethane | 5[b] |
| Di (2-ethylhexyl) phthalate | 4[b] |
| Dichlorodifluoromethane | 1,400[c] |
| Trichlorofluoromethane | 2,400 [c] |

*Notes:*
a. List of COCs from the 1992 ROD.
b. State MCL listed in the 1992 ROD.
c. Federal MCL listed in the 1992 ROD.
µg/L = micrograms per liter

## 2.4 Implementation of 1992 ROD Selected Remedy

The Site's remedial design (RD) was started in February 1993 and approved by the EPA in April 1995. The EPA issued a Unilateral Administrative Order for the remedial action (RA) in February 1995, which directed site PRPs to implement the RA described in the ROD. RA construction began in August 1995 and was completed in January 1997.

Construction of the remedy was completed between August 1995 and January 1997. RA construction activities included installation of the cover system; construction of the cover and stormwater management system; and installation of a gas monitoring system. During implementation of the cap and stormwater pond at the YTA in October 1995, additional drums were encountered and disposed of at a permitted off-site facility.

The PRPs installed a groundwater pump-and-treat system in 1996 to remediate contaminated groundwater. Recovery flow rates of the three recovery wells were 155 to 180 gallons per minute (gpm), which is within the targeted range of 150 gpm to 250 gpm. The treatment system included an air stripping tower and the GAC filter system. Treated groundwater was discharged back into the Floridan Aquifer through recharge wells downgradient of the YTA. In 2006, the PRPs removed the GAC system because the effluent from the air stripper contained contaminant concentrations below MCLs for four consecutive quarters.

The ROD also called for institutional controls to restrict access to the landfill area; restrict on-site construction activities that would involve excavation; restrict future use of the Site to prevent construction of water supply wells; and restrict construction of water supply wells on downgradient parcels. Access restrictions including secured fencing and signage were implemented at the Site. The City of Madison issued Ordinance Number 2001-6, which restricts excavation and construction on the Site. Water supply well permitting is managed by SRWMD and City of Madison Ordinance Number 2001-6; two additional Madison County ordinances also restrict well placement on the site property. Madison County acquired three additional parcels to expand the monitoring well network in 2015. Additionally, the County filed a Declaration of Restrictive Covenants for the Site that places use

restrictions on the YTA and surrounding parcels. Copies of the City and County Ordinances and Land Use Restrictions can be found in Appendices B and C respectively.

## 3.0 Basis for Taking Action

### 3.1 Shutdown of the Pump-and-Treat System

Based on an analysis of monitoring data from 2006 to 2010, the 2010 FYR Report identified that groundwater remedial goals for CVOCs were consistently exceeded without significant decline in concentration in multiple on-site wells (IT-1 S/I/D; IT-13I; YTA-1; M-1R; RW-1 and RW-3R; shown on the map of the current monitoring well network in Figure 2), suggesting the possible presence of additional source material outside the YTA capped area or in the saturated zone beneath the Site. At the request of the EPA and FDEP, the PRP ITT[1] added 1,4-dioxane to the third quarter groundwater sampling event conducted in November 2010. In December 2010, ITT shut down the pump-and-treat system because the 1,4-dioxane concentration in the air stripper influent and effluent were above the Florida GCTL criteria of 3.2 µg/L. FDEP injection requirements from Chapter 62-528 of the Florida Administrative Code (FAC) prohibits the reinjection of contaminants above GCTLs or primary drinking water standards such as MCLs. Since the shutdown of the pump-and-treat system, 1,4-dioxane concentrations in multiple wells have consistently exceeded the Florida GCTL; therefore, the EPA has elected to officially make 1,4-dioxane a Site COC as part of this AROD. Data shows that the highest concentrations appear to be migrating from the southwest corner of the YTA. Table 3 and Figure 3 show trends of 1,4-dioxane in older and newer wells respectively. The source and extent of 1,4-dioxane has not yet been determined; however, the contaminant has not been detected outside of the Site boundary.

### 3.2 Further Investigations of Groundwater Treatment Technologies

Following the shutdown of the groundwater pump-and-treat system in 2010, ITT was prompted to further investigate the YTA and other alternative treatment technologies to address Site CVOCs and 1,4-dioxane. In 2011, ITT completed and submitted a draft focused feasibility study that recommended monitored natural attenuation (MNA) to address 1,4-dioxane. However, the EPA and FDEP indicated that insufficient data was provided to support MNA and recommended pilot studies for active treatment technologies. Thus in 2011, ITT began additional delineation of CVOCs and 1,4-dioxane within and around the YTA. From December 2011 to July 2012, ITT conducted a bench-scale pilot study evaluating an advanced oxidation process (AOP) to treat 1,4-dioxane. The advanced oxidation process was expected to remove 1,4-dioxane via oxidation through reactions with hydroxyl radicals. ITT submitted the final FFS Report to the EPA and FDEP in November 2013 recommending an AOP remedial alternative to augment the existing pump-and-treat system to address 1,4-dioxane. In July 2014, ITT notified the EPA that the AOP construction contract was put on hold due to a planned bankruptcy notice from the AOP contractor. Shortly after, ITT submitted results from YTA investigations in August 2014 that included the recommended use of an interim remedial measure (IRM) - enhanced reductive dechlorination (ERD) - to reduce CVOC concentrations in the YTA.

[1] Although all three PRPs are subject to the UAO for RA, PRP ITT has assumed the lead for remedial activities according to an agreement among the PRPs.

### 3.3 YTA Investigations/Conceptual Site Model

To further evaluate the nature and extent of CVOCs and 1,4-dioxane, comprehensive investigations of the northwest, southeast, and southwest corners of YTA at the Site were completed in five phases from November 2011 to August 2018. The objectives of the soil and groundwater investigations were to further evaluate isolated areas of elevated CVOCs and 1,4-dioxane concentrations, specifically in the vadose zone soil in the vicinity of two former drum removal areas (northwest and southeast corners) in the YTA, and in the surficial water-bearing zone and bedrock in the vicinity of the two former drum removal areas (northwest corner and southeast corners) and one isolated location (southwest corner, just outside the YTA).

During the investigation, the extent of each of the three areas with the highest CVOC concentrations was evaluated to the Florida natural attenuation default criteria (NADC) concentrations in Table V of F.A.C. 62-770, as well as the ten times (10X) NADC value. FDEP NADCs were used to identify areas requiring treatment initially, but more treatment can be performed as part of optimization. Cleanup levels in groundwater are based on the more stringent of the FDEP GCTLs or the EPA MCLs. A summary of these evaluations is below.

***Northwest Corner of YTA***

The former northwest drum removal area was investigated using 4 continuous sonic soil borings, 9 vadose zone soil borings, 3 membrane interface probe (MIP) soil borings, 32 direct push technology (DPT) borings, and 4 permanent monitoring wells. The geology immediately beneath the former drum removal area is unaltered by karst activity and consists of predominantly sand and clayey sand that grades into sandy phosphatic clay and is underlain by limestone at a depth of approximately 60 feet (ft) below land surface (bls).

To the immediate east, southeast, and south of the former drum removal area, a paleosink feature is apparent, and the geology is comprised of infilled very fine-to-medium sand to depths exceeding 120 ft bls as shown in Figure 4. The unconfined water table was encountered in the overburden deposits in March 2020 at about 38 ft bls (65 feet above mean sea level [amsl]), which corresponds to a saturated overburden thickness of approximately 22 ft. The water table elevation exhibits seasonal fluctuation of about 5 ft.

Groundwater movement in both the surficial water-bearing unit and the upper Floridan (UF) bedrock is to the south/southeast. CVOCs have migrated horizontally from the former drum removal area, which is underlain by natural geologic sediments, to the east and into a sand-filled paleosink. The CVOCs have migrated vertically downward in the paleosink for the following reasons:

- The infilled sand is well sorted and considerably more permeable than the natural geologic deposits and does not contain any fine-grained impeding or confining clayey lenses.
- A notable vertical hydraulic gradient of -0.03 ft/ft is present.
- CVOC constituents are denser than the groundwater.

Based on the DPT results, the majority of the CVOC mass is present in a 36-foot-thick interval from 34–70 ft bls. Continuous MIP soil borings showed excellent correlation to the DPT data, with high

electron capture detector (ECD) responses correlating to high CVOC concentrations decreasing notably at depths of 67 ft bls (DP25) to 74 ft bls DP26).

Horizontal delineation to ten times (10X) Florida natural attenuation default criteria (NADC) has been completed and is comprised of an approximate 0.14-acre area with an estimated vertical extent that extends from 69 ft amsl to -29 ft amsl (98 feet thick). The elevation range corresponds to a depth of about 34–132 ft bls. The 10X NADC vertical extent was estimated to be 132 ft bls by comparing mean CVOC groundwater data from DP25 and IT19DD, then extrapolating to the 10X NADC concentration for cis 1,2 dichloroethane (DCE) (7,000 microgram per liter [µg/L]). The NADC isocontour line is estimated to be 0.65, acres as shown in Figure 5.

The predominant CVOCs detected, and concentration range, were cis 1,2-DCE (1U to 98,000 µg/L) and vinyl chloride (0.71U to 6,200 µg/L). Lower CVOC concentrations were noted, below their respective 10X NADC values, for trichloroethene (TCE) (0.55U to 1,400 µg/L) and 1,4-dioxane (1U to 9.25J µg/L).

A vadose zone soil investigation was completed at nine soil boring locations (SB01 to SB09) within the footprint of the northwest former drum removal area and included 25 soil samples submitted for VOC laboratory analyses. No soil samples exceeded Florida commercial soil cleanup target levels (SCTL); therefore, no additional assessment or remediation is recommended.

***Southeast Corner of YTA***

The geology in the vicinity of the former drum removal area has been altered by karst activity and is located within a paleosink that has been infilled with sandy clay and silty clay that grades into fine sand with depth. Limestone was not encountered in the three sonic borings adjacent to the former drum removal area at depths of up to 90 ft bls; however, limestone was encountered to the south at Sonic 04 (39 ft bls or 56 ft amsl) and numerous monitoring and recovery wells to the southeast, south, and southwest, as shown in Figure 6. The unconfined water table was encountered in the overburden deposits at about 31 ft bls (64 ft amsl), which corresponds to a saturated overburden thickness above limestone bedrock of approximately 8 feet.

Groundwater movement in the surficial water-bearing unit is to the south and southwest, whereas potentiometric surface maps of the UF bedrock indicate movement consistently to the southeast. CVOCs have migrated from the former drum removal area through the underlying paleosink clayey and deeper sand deposits and have moved both to the west/southwest into the sand-filled paleosink and to the southeast, south, and southwest into natural limestone bedrock. The infilled paleosink sand beneath the clayey deposits, as well as sand deposits to the west/southwest, are well sorted, permeable, and do not contain any fine-grained impeding or confining clayey lenses. For these reasons, the CVOC plume has expanded to both the west/southwest through paleosink sand deposits and to the south/southwest where limestone bedrock is present.

Horizontal delineation to 10X Florida NADCs is comprised of an approximate 0.47-acre area and a vertical range of 20 ft amsl to 65 ft amsl (45 feet thick). The elevation range corresponds to a depth of about 30–75 ft bls. The vertical delineation to 10X Florida NADCs has been documented with the vertical extent DP03, DP20, and IT-20DD analytical results. The NADC isocontour line is estimated to be 1.5 acres, as shown in Figure 7.

The predominant CVOCs detected, and concentration range, were TCE (0.55U to 260,000E µg/L); cis 1, 2-DCE (0.49U to 170,000 µg/L); and vinyl chloride (0.71U to 16,000 µg/L). The highest TCE

concentrations in this area may provide indirect evidence of Dense Non-Aqueous Phase Liquid (DNAPL); however, no visual or olfactory evidence of DNAPL was ever noted during extensive soil and groundwater investigations. The constituent 1,4-dioxane was detected below its respective 10X NADC value at concentrations ranging from 1U to 2,120 µg/L. The 1,4-dioxane concentrations exceeding 100 µg/L (5 depth intervals) were detected at DP61, exclusively. Three continuous MIP soil borings were completed to a depth of 75 ft bls to document the approximate vertical extent of CVOCs. Based on a review of the ECD logs, CVOC concentrations decreased notably at a depth of 54 feet (DP03). Based on the MIP logging and groundwater analytical results from IT-20DD, adequate vertical delineation has been completed. The vadose zone soil investigation at nine locations (SB10 to SB18) within the footprint of the southeast former drum removal area included 23 soil samples submitted for laboratory analyses; six samples, collected from SB13 and SB14, exceeded Florida commercial SCTLs. The CVOC exceedances were detected primarily in the center boring SB14, with only very low vinyl chloride and flame ionization detector (FID) detections in SB13; therefore, horizontal and vertical delineation has been completed. The isolated SB14 soil exceedances represent negligible CVOC mass at this site and the location is beneath an engineered clay cap inside a secured and locked fence; therefore, no additional assessment or remediation was completed.

***Southwest Corner of YTA***

An isolated high-CVOC area just outside the YTA fence line was identified during installation and groundwater sampling of IT22LS and IT22S. This area was investigated by sampling groundwater from seven DPT borings. The geology in the area is outside the paleosink feature and consists of predominantly interbedded sand and sandy clay to a depth of 50 ft bls, where limestone bedrock was encountered. The unconfined water table was encountered in the overburden deposits at about 45 ft bls (58 ft amsl), which corresponds to a saturated overburden thickness above bedrock of approximately 5 feet.

Groundwater movement in the surficial water-bearing unit converges from both the north and south into the east/west-oriented topographically lower area just south of the YTA, and likely correlates to the orientation and weathering of underlying bedrock fractures. Groundwater in the overburden sandy clay is unconfined, and there is a downward vertical gradient into the underlying UF bedrock unit. CVOCs have migrated vertically from the IT22LS/IT22S area through the sandy clayey deposits and into the upper portion of the limestone bedrock. The CVOCs in groundwater have migrated in an east/west direction in the area encompassed by DP74 and DP64, following the orientation of the underlying bedrock fractures.

Horizontal delineation to 10X Florida NADCs is comprised of an approximate 0.28-acre area and a vertical range of 33 ft amsl to 58 ft amsl (25 feet thick). The elevation range corresponds to a depth of about 45–70 ft bls. The vertical delineation to 10X Florida NADCs has been documented with the vertical extent IT22S analytical results. The NADC isocontour line is estimated to be 1.14 acres, as shown in Figure 8.

The predominant CVOCs detected, and concentration range, were TCE (0.89U to 22,000 µg/L); cis-1, 2-DCE (0.53U to 2,200 µg/L); and vinyl chloride (0.71U to 47 µg/L). The constituent 1,4-dioxane was detected during monitoring well sampling at concentrations ranging from 92 to 200 µg/L.

### 3.4 ERD Pilot Study

From August 2014 to September 2016, ITT completed additional YTA investigations and recommended using enhanced reductive dechlorination (ERD) using emulsified vegetable oil (EVO) to reduce CVOC concentrations in the YTA. The ERD process was expected to accelerate the natural biodegredation process by providing a carbon source, nutrients, and electron donors to enhance the rapid conversion of CVOC contaminants to nontoxic end products. The EPA and FDEP approved of ITT's ERD Pilot Test Work Plan, and ITT completed the pilot test between October 2017 and June 2018, which included a baseline sampling event in October 2017, EVO injection in March 2018, and post-injection monitoring in September 2018 and 2019.

A review of the overall mean concentrations of Site CVOCs from the baseline to the 18-month post-injection sampling event can be found in the in the December 2019 ERD Pilot Test Post-Injection Performance Monitoring Letter Report. In short, the injection sampling event indicated that trichloroethylene (TCE) concentrations substantially decreased (1,483 µg/L to 189 µg/L, 87% reduction); mean cis-1,2-dichloroethylene (DCE) concentrations decreased notably (31,845 µg/L to 18,330 µg/L, 42% reduction); and vinyl chloride (VC) remained relatively constant (392 µg/L to 388 µg/L, 1% reduction). The substantial decrease in mean TCE and cis-1,2-DCE concentrations provided evidence that ERD, using EVO as the substrate, could be an effective treatment technology for addressing CVOCs at the MCSL Site.

Table 4 presents TCE and degradation product trends from 2016 to 2019 (post pilot ERD injections).

**Table 4: TCE and Degradation Product Concentration Trends (2016-2019)**

| COC | Southern YTA | | | Southwest and Downgradient of YTA | | |
|---|---|---|---|---|---|---|
| | Well ID | Concentration (µg/L) | Sample Date | Well ID | Concentration (µg/L) | Sample Date |
| TCE | IT20S | 21,000 | Sep 2019 | IT22LS | 17,000 | Sep 2019 |
| | | 32,000 | Mar 2019 | | 22,000 | Mar 2019 |
| | | 99,000 | Sep 2018 | | 27,000 | Sep 2018 |
| | | 38,000 | Mar 2017 | | 15,000 | Sep 2017 |
| | | 31,000 | Sep 2017 | | Well not yet installed | |
| | | 34,000 | Mar 2017 | | | |
| | | 42,000 | Oct 2016 | | | |
| Cis-1,2-DCE (TCE daughter product) | IT20S | 71,000 | Sep 2019 | IT22LS | 880 | Sep 2019 |
| | | 91,000 | Mar 2019 | | 800 | Mar 2019 |
| | | 120,000 | Sep 2018 | | 840 | Sep 2018 |
| | | 96,000 | Mar 2017 | | 500 | Sep 2017 |
| | | 79,000 | Sep 2017 | | Well not yet installed | |
| | | 83,000 B | Mar 2017 | | | |
| | | 87,000 B | Oct 2016 | | | |
| Vinyl chloride (daughter product) | IT20S | 5,700 | Sep 2019 | IT22LS | 180 U | Sep 2019 |
| | | 6,600 | Mar 2019 | | 140 U | Mar 2019 |
| | | 6,000 | Sep 2018 | | 140 U | Sep 2018 |
| | | 5,300 | Mar 2017 | | 140 U | Sep 2017 |
| | | 4,200 | Sep 2017 | | Well not yet installed | |
| | | 5,100 | Mar 2017 | | | |
| | | 5,700 | Oct 2016 | | | |

*Notes:*
B - Result is judged to be an artifact because of contamination in associated blanks.
U - Below detection. Detection limit listed.
Source: Semi-Annual Monitoring Report 3rd Quarter 2019. Prepared by MSE Group, LLC. December 2019.
The maximum of duplicate samples was selected when duplicate sample was collected.

The ERD pilot study did not show evidence of 1,4-dioxane mass reduction; however, in the 2021 Madison County Sanitary Landfill Feasibility Study, the PRP recommended in-situ chemical oxidation (ISCO) as a hot spot treatment to address areas with elevated 1,4-dioxane concentrations. ISCO is a known treatment technology for 1,4-dioxane and CVOCs.

In conclusion, the ERD pilot study proved to be a beneficial treatment technology for addressing CVOCs and could potentially change subsurface conditions to allow for 1,4-dioxane concentrations to degrade or reduce over time.

## 4.0 Description of Proposed Alternatives

ITT prepared a Feasibility Study in November 2021 to develop, evaluate, and screen potential remedial alternatives to address chlorinated volatile organic compounds (CVOCs) and 1,4-dioxane detected in groundwater at the Site.

FDEP NADCs are used to identify areas requiring treatment initially, but more treatment can be performed as part of optimization. The cleanup levels for each of the COCs are based on more stringent of the FDEP GCTLs at F.A.C. 62-770 Table I or the EPA MCLs.

Three alternatives were considered and are summarized below as follows:

***Alternative 1: No Action***

The No-Action alternative is required to be evaluated under the National Contingency Plan as a baseline against which all other alternatives are compared. Under this alternative, no remedial actions would take place.

There is no cost associated with the No-Action alternative.

Estimated Time to Achieve RAOs/Cleanup Levels: N/A

***Alternative 2: Phased In-situ Chemical Oxidation (ISCO) Followed by Performance Monitoring***

Alternative 2 recommended an initial phase of ISCO treatment of the plume source areas in the northwest corner, southeast corner, and southwest corner of the YTA (those above 10X Natural Attenuation Default Criteria) followed by a second phase of ISCO treatment of the remaining CVOC dissolved-phase groundwater above NADCs and 1,4-dioxane above GCTLs, where present, in each of the three source areas of the YTA (northwest corner, southeast corner, and southwest corner).

***Alternative 3: Phased ERD with Supplemental Amendments Followed by Performance Monitoring and Optional ISCO Hotspot Treatment for 1,4-Dioxane***

Alternative 3 recommended a phased treatment using ERD with supplemental amendments (such as dehalobacter bioaugmentation, lactate or ethanol, highly degradable soluble carbon substrates, and/or EZVI) followed by performance monitoring. An initial phase of ERD with supplemental amendments would be used to treat the elevated CVOC areas (above 10X NADC) in groundwater at each of the three areas (northwest corner, southeast corner, and southwest corner). The selected use of supplemental amendments would be based on localized conditions within the treatment areas of the plume. A second phase of ERD treatment with supplemental amendments would then be conducted to address hotspot concentrations remaining in the elevated CVOC areas as well as groundwater plume areas above NADCs. If DNAPL is confirmed in any of the elevated CVOC areas, a targeted hotspot treatment would be further evaluated. Performance monitoring would be implemented for the remaining areas of the plume containing COC concentrations below NADCs but above GCTLs. DPT would be used, along with groundwater monitoring wells, to evaluate and monitor treatment effectiveness.

Should the dechlorination process stall at vinyl chloride, additional treatments utilizing supplemental amendments or ISCO would be evaluated. Additionally, as an optional contingency should ERD not change subsurface conditions to allow for 1,4-dioxane to degrade or reduce over time, 1,4-dioxane hotspots would be treated using ISCO with an oxidant as part of a phased remediation approach.

## 5.0 Comparative Analysis of Alternatives

This section uses nine criteria set forth in 40 C.F.R. § 300.430(e)(9)(iii) to evaluate the remedial alternatives of the originally selected 1992 ROD remedy compared to the remedial alternatives considered for selection in this ROD Amendment. An outline of the nine criteria is below.

| Evaluation Criteria for Superfund Remedial Alternatives | |
|---|---|
| *Threshold Criteria* | 1. **Overall Protection of Human Health and the Environment** determines whether an alternative eliminates, reduces, or controls threats to public health and the environment through institutional controls, engineering controls, or treatment. |
| | 2. **Compliance with ARARs** evaluates whether the alternative meets Federal and State environmental statutes, regulations, and other requirements that pertain to the site, or whether a waiver is justified. |
| *Primary Balancing Criteria* | 3. **Long-term Effectiveness and Permanence** considers the ability of an alternative to maintain protection of human health and the environment over time. |
| | 4. **Reduction of Toxicity, Mobility, or Volume of Contaminants through Treatment** evaluates an alternative's use of treatment to reduce the harmful effects of principal contaminants, their ability to move in the environment, and the amount of contamination present. |
| | 5. **Short-term Effectiveness** considers the length of time needed to implement an alternative and the risks the alternative poses to workers, residents, and the environment during implementation. |
| | 6. **Implementability** considers the technical and administrative feasibility of implementing the alternative, including factors such as the relative availability of goods and services. |
| | 7. **Cost** includes estimated capital and annual operations and maintenance costs, as well as present worth cost. Present worth cost is the total of an alternative over time in today's dollar value. Cost estimates are expected to be accurate within a range of +50 to -30 percent. |
| *Modifying Criteria* | 8. **State/ Support Agency Acceptance** considers whether the State agrees with EPA's analyses and recommendations, as described in the FS and Proposed Plan. |
| | 9. **Community Acceptance** considers whether the local community agrees with EPA's analyses and preferred alternative. Comments received on the Proposed Plan are an important indicator of community acceptance. |

***Alternative 1: No Action***

***Alternative 2: Phased In-situ Chemical Oxidation (ISCO) Followed by Performance Monitoring***

***Alternative 3: Phased ERD with Supplemental Amendments Followed by Performance Monitoring and Optional ISCO Hotspot Treatment for 1,4-Dioxane***

***Original Selected Remedy: Pump-and-Treat with Groundwater Monitoring***

Since this ROD Amendment selects a change only to the groundwater portion of the Sitewide 1992 ROD, which selected a combined remedy for both landfill waste and groundwater, only the groundwater portion of the 1992 ROD will be evaluated against the nine criteria.

### 5.1 Overall Protection of Human Health and the Environment

The original groundwater treatment remedy is no longer protective of human health and the environment since the detection of 1,4-dioxane in the Floridan aquifer required the pump-and-treat system to be shut down per Florida's regulations. Additionally, Site CVOCs did not show evidence of natural attenuation during the period that the pump-and-treat system has been shut down; therefore, with no other treatment technology in effect, the contaminants would remain and pose a threat to human health and the environment.

Alternative 1 is not expected to provide protection of human health and the environment.

Alternative 2 provides protection of human health and the environment. ISCO is expected to oxidize the dissolved-phase contaminants in groundwater and speed up removal. Groundwater monitoring will assist with protecting human health and the environment by mapping plume reduction and helping predict when remediation will reach preliminary remediation goals (PRGs).

Alternative 3 is protective of human health and the environment. Phased ERD with supplemental amendments and performance monitoring will provide sustained reduction of CVOCs. Optional ISCO hotspot treatment, should ERD not change subsurface conditions to allow for 1,4-dioxane to degrade or reduce over time, would address 1,4-dioxane, if remaining. Groundwater monitoring will assist with protecting human health and the environment by mapping plume reduction and helping predict when remediation will reach PRGs.

### 5.2 Compliance with ARARs

Section 121(d) of CERCLA, as amended, specifies, in part, that remedial actions for cleanup of hazardous substances must comply with requirements and standards under federal or more stringent state environmental laws and regulations that are applicable or relevant and appropriate (i.e., ARARs) to the hazardous substances or particular circumstances at a site or justify invoking a waiver under Section 121(d)(4). See also 40 C.F.R. §§ 300.430(f)(1)(ii)(B) and (C), and 40 C.F.R. §§ 300.430(f)(5)(ii)(B) and (C). ARARs for the remedial alternatives are presented in the Feasibility Study (2021).

The original groundwater treatment remedy and Alternative 1 do not comply with any of the chemical-specific ARARs as no action will be taken to reduce contaminant concentrations. Action-specific ARARs are not applicable since no response action would be undertaken.

Alternatives 2 and 3 are expected to comply with all chemical-specific and action-specific ARARs.

### 5.3 Long-term Effectiveness and Permanence

The original groundwater treatment remedy in not expected to provide long-term effectiveness and permanence because the pump-and-treat system is not designed to treat 1,4-dioxane. Additionally, while the pump-and-treat system is shutdown per Florida's reinjection standards, none of the contaminants of concern are being treated.

Alternative 1 does not offer any long-term effect or permanence because contaminated groundwater would remain in place. Although contamination concentrations may eventually decrease toward the cleanup goals through natural attenuation, no monitoring would be conducted to verify this.

Alternative 2 is expected to provide long-term effectiveness and permanence if there is sufficient contact between the oxidizer and contaminants.

Alternative 3 is expected to provide long-term effectiveness and permanence. Pilot ERD injections at the site have demonstrated effectiveness for treating CVOCs, and ISCO hotspot treatment has been proven effective for 1,4-dioxane at other sites.

### 5.4 Reduction of Toxicity, Mobility, or Volume Through Treatment

Alternative 1 is not expected to reduce toxicity, mobility, or volume of contamination through treatment as no treatment would take place.

Alternative 2 is expected to achieve a high reduction of toxicity, mobility, and volume of COC contaminants in groundwater as long as sufficient contact occurs between the oxidizer and contaminants.

Alternative 3 is expected to achieve reduction in toxicity, mobility, and volume of COCs in the groundwater by enhanced biodegredation. An ERD pilot test injection at the site successfully demonstrated a significant reduction in CVOC contaminant mass in groundwater.

### 5.5 Short-term Effectiveness

The original groundwater treatment remedy in its current shutdown status and Alternative 1 pose no risk to onsite workers nor will they result in short-term adverse impacts to the environment or local community. These alternatives would not achieve the remedial action objectives.

Alternative 2 is expected to result in limited short-term effects, all of which can be managed. Short-term effects of in-situ ISCO injections could include bromide to bromate formation, decrease in groundwater pH, and changes to the geochemistry of the water at the site to unfavorable natural attenuation conditions. Additionally, chemicals used for ISCO would not pose a human health hazard as long as proper health and safety precautions are implemented.

Alternative 3 is expected to result in limited short-term effects, all of which can be managed. The most significant short-term effects of ERD remedies can be changes to groundwater flow, including mounding and geochemistry changes such as lowered pH, and increase in compounds such as chloride

and methane. Short-term effects of ISCO for the third phase of the alternative could be bromide-to-bromate formation, decrease in groundwater pH, and changes to the geochemistry of the water at the site to unfavorable conditions. These short-term effects can be minimized by using experienced vendors and contractors to complete the remedial alternative, as well as complying with the substantive requirements of FDEP regulations governing subsurface injections of remediation amendments.

### 5.6 Implementability

The original groundwater treatment remedy is not implementable in its current shutdown status.

Alternative 1 is readily implementable as no action would occur.

Alternative 2 is implementable as the equipment, materials, and contractors needed to execute the remedy are readily available. The technologies have seen success at other sites with similar COCs in groundwater.

Alternative 3 is implementable. An ERD pilot test has already been conducted at the site, and ISCO technology has been demonstrated at similar sites. The equipment, materials, and contractors needed to implement this remedy are readily available.

### 5.7 Cost

Original Groundwater Treatment Remedy*:
(as estimated in the 1992 ROD)
Estimated Capital Costs: $3,445,750
Estimated Annual Operation & Maintenance (O&M) Costs: $109,600 - $409,600
Estimated Present Worth Costs: $5,191,000

> *Since the pump-and-treat system is currently in shutdown status, the only costs associated with the original groundwater treatment remedy are for O&M. The O&M costs from 2015 to 2019 ranged from $99,000 to $158,000.

No cost is associated with Alternative 1 because no remedy would be implemented.

<u>Alternative 2:</u>
Estimated Capital Costs: $6,646,000
Estimated Annual O&M Costs: $1,661,000
Estimated Present Worth Costs: $8,307,000
Estimated Time for Construction Completion: 50.5 weeks

<u>Alternative 3:</u>
Estimated Capital Costs: $4,854,000
Estimated Annual O&M Costs: $1,729,000
Estimated Present Worth Costs: $6,583,000
Estimated Time for Construction Completion: 50 weeks

### 5.8 State Acceptance

The State of Florida, as represented by FDEP, has been actively involved in the process of determining and evaluating the Madison County Sanitary Landfill cleanup alternatives. FDEP has expressed support for the selected amended remedy: Phased ERD with Supplemental Amendments Followed by Performance Monitoring and Optional ISCO Hotspot Treatment for 1,4-Dioxane. FDEP's review of the ROD Amendment is included as Appendix D.

### 5.9 Community Acceptance

The EPA has not received comments from the community on the past three FYRs, and no comments were received from the community during the public comment period for the selection of the proposed remedy.

## 6.0 Selected Amended Remedy

### 6.1 Summary of the Rationale for the Selected Amended Remedy

The intent of the newly selected remedy is to reduce concentrations of CVOCs and 1,4-dioxane in groundwater outside of the YTA capped area of the Site to attain cleanup levels (i.e., drinking water standards). The approach is to first focus on the known source areas and the highest groundwater concentrations at the Site. The use of a phased approach will allow for the opportunity to reduce the concentrations of Site COCs and monitor the effectiveness of the treatment while concurrently collecting additional characterization data to determine the extent and potential source of 1,4-dioxane. Routine sampling and performance monitoring will assist in determining treatment effectiveness and will be used as an indicator for when the next phase should occur.

The shutdown of the originally selected pump-and-treat system prompted the need for the PRPs to analyze alternative treatment technologies and eventually led to the PRPs conducting the ERD pilot study. Results from the ERD pilot study post-monitoring events, described in further detail in Section 3.4, provides evidence of treatment effectiveness in reducing CVOC concentrations. ERD has also proven effective at reducing CVOCs at similar sites and may change subsurface conditions to allow 1,4-dioxane to degrade or reduce over time. ISCO, if needed to address 1,4-dioxane, has also proven effective at similar sites.

Current available data is sufficient to select the amended remedy, but additional data will be collected during the Remedial Design phase to refine the estimated timeframe in which RAOs/cleanup levels will be achieved. The current estimated timeframe for CVOCs to reach cleanup levels is 12-27 years. This timeframe was determined from an extrapolation of the 48% mass reduction observed over the 18-month ERD pilot study period; however, additional data is necessary to more accurately estimate the time it will take to reach cleanup levels. Figures E.1 and E.2 in Appendix E, show graphs of the current estimated time it will take CVOCs to reach cleanup levels.

### 6.2 Description of the Selected Amended Remedy

The selected amended remedy addresses Site COCs, CVOCs and 1,4-dioxane, that are present in groundwater. The contaminated groundwater under the YTA engineered cap is considered to be a waste management area at this Site; therefore, consistent with the EPA policy, only groundwater located outside of the capped area is being addressed with this selected amended remedy. Restoration of groundwater to drinking water standards underneath the YTA cap is not required or expected. The selected amended remedy includes a phased treatment of the COCs with an initial focus on the known source areas located in the northwest and southeast corners of YTA, as well as an isolated location just outside of the YTA in the southwest corner. FDEP 10X NADCs will be used to identify areas requiring treatment initially, but more treatment can be performed as part of optimization of the remedy. The cleanup levels for the COCs are based on more stringent of the FDEP GCTLs or the EPA MCLs.

The selected amended remedy will be implemented in phases and includes ERD with supplemental amendments followed by performance monitoring and ISCO hotspot treatment for 1,4-dioxane and vinyl chloride if necessary.

Due to the complex geological stratigraphy within the elevated CVOC areas, diffusion-limited conditions within certain portions of the plume may occur.[2] These diffusion-limited conditions, where present, could extend the time for ERD to reduce the volume of CVOCs, potentially requiring multiple and ongoing injections. The use of supplemental amendments within the diffusion-limited elevated CVOC areas could improve treatment performance. The zone of treatment will extend beyond the source areas in the northwest, southeast, and southwest corners of the YTA into the paleokarst feature based on the groundwater flow in the surficial water-bearing unit and Upper Floridan. This treated groundwater will likely diffuse through the paleosink feature (comprised of infilled very fine-to-medium sand) between the three source areas around the YTA.

The selected phased remedy amendment includes the following:

- ERD with supplemental amendments will serve as the initial phase of the remedy to treat the elevated CVOC areas (above 10X NADC) and is used to accelerate the natural biodegradation process by providing a carbon source, nutrients, and electron donors to enhance the rapid conversion of CVOC contaminants to nontoxic end products.

- An electron donor (such as emulsified vegetable oil or other electron donor solution) will be used to enhance the natural biodegradation reductive dechlorination process and, along with the supplemental amendment, will be injected at the treatment areas.
    - Supplemental amendments (dehalobacter bioaugmentation, lactate or ethanol, highly degradable soluble carbon substrates, and/or EZVI) will help to induce anaerobic conditions and reduce the microbial lag phase attributable to anaerobic bacteria when injected in conjunction with the supplied electron donor; the selected use of supplemental amendments will be based on localized conditions within the treatment areas of the plume. Slowly, the electron donor along with the selected supplemental amendment will dissolve into the groundwater, thereby providing a slow release of carbon to drive

---

[2] The predominantly sandy sediments within the sinkhole have a greater permeability than the adjacent competent limestone. The sinkhole sediments are the location of the highest concentrations, and that contamination has diffused via advective flow into the limestone. (See Figures 4 and 6)

reductive dechlorination for approximately two to five years. The reductive dechlorination processes are anticipated to increase over time within the injection area, effectively creating a bio-reactive zone to degrade chlorinated ethene compounds.

- A second phase of ERD treatment with supplemental amendments will be conducted to address the hotspot concentrations remaining in the elevated CVOC areas as well as groundwater plume areas above NADCs.
  - If DNAPL is confirmed in any of the elevated CVOC areas, a targeted hotspot treatment will be implemented.

- The third phase of the treatment remedy will consist of performance monitoring and will be implemented for the remaining areas of the plume containing CVOC concentrations below NADCs but above GCTLs. Groundwater monitoring wells and other technologies will be used to evaluate and monitor treatment effectiveness.

- If the dechlorination process stalls at vinyl chloride, meaning the microbes are not present in sufficient quantities to allow for dechlorination, the vinyl chloride hotspots will be treated utilizing ERD with supplemental amendments or ISCO.*

- *The fourth phase will include ISCO hotspot treatment for any areas with elevated 1,4-dioxane concentrations.*

*Should ERD change subsurface conditions to allow for vinyl chloride and 1,4-dioxane to degrade or reduce to achieve cleanup levels over time, no further evaluation on supplemental treatment will be necessary.

The active treatment areas for the northwest, southeast, and southwest corners of the YTA for the selected amended remedy are shown on Figure 9, Figure 10, and Figure 11, respectively.

### 6.3 Implemented Institutional Controls

ICs were implemented as part of the original selected remedy in the1992 ROD in the form of land and groundwater use restrictions as well as site access restrictions. In 2013, the County purchased three parcels of land adjacent to the YTA (11-1N-09-3486-001-000) to expand the site boundary for monitoring the groundwater plume. These parcels include the parcel east of the YTA (11-1N-09-3487-003-000) and two parcels southeast of the Site (11-1N-09-3488-001-01A and 11-1N-09-3488-002-001). In May 2019, the County filed a Declaration of Restrictive Covenants to restrict land use and groundwater use at all four parcels. All required institutional controls are in place, as summarized in Table 5. Figure 12 shows the current interpretation of the groundwater plume and the institutional control boundaries. In addition, County and City ordinances are in place that restrict groundwater use and installation of wells. As a result, and as documented in previous FYRs, private wells are no longer used for drinking water, and downgradient property owners are connected to the City of Madison water supply. Copies of the City and County ordinances in place are included in Appendix B. Copies of the land use restrictions are included in Appendix C.

The EPA has evaluated the current ICs and finds them sufficient in limiting human exposure to contamination and are considered part of the final remedy for this Site.

**Table 5: Summary of Implemented Institutional Controls**

| Media That Do Not Support UU/UE Based on Current Conditions | ICs Needed | ICs Called for in the Decision Documents | Impacted Parcel(s) | IC Objective | Title of IC Instrument Implemented and Date (or planned) |
|---|---|---|---|---|---|
| Groundwater | Yes | Yes | 11-1N-09-3486-001-000<br>11-1N-09-3487-003-000<br>11-1N-09-3488-001-01A<br>11-1N-09-3488-002-001<br>11-1N-09-3488-002-000<br>11-1N-09-3488-002-002 | Restrict groundwater use and prevent installation of any type of well. | County Ordinance 92-5 restricts installation of wells within city limits. |
| | | | | | City Ordinance 2001-6 restricts water well installation, excavation and construction on site. |
| | | | | | County Ordinance 99-108 requires new commercial or residential facilities to connect to a city or county water supply if located within 200 feet of a connection. |
| | | | | | Declaration of Restrictive Covenants, May 31, 2019. |
| Soil | Yes | Yes | 11-1N-09-3486-001-000<br>11-1N-09-3487-003-000<br>11-1N-09-3488-001-01A<br>11-1N-09-3488-002-001 | Restrict land use to industrial uses and restrict activities that would impact the integrity of the cap. | City Ordinance 2001-6 restricts water well installation, excavation and construction on site. |
| | | | | | Declaration of Restrictive Covenants, May 31, 2019 |

The implementation of additional ICs is not anticipated as result of the selected amended remedy.

### 6.4 Key Chemical-Specific ARARs

The 1992 ROD identified cleanup goals for the 11 groundwater COCs that were based on federal MCLs. If Florida groundwater concentration guidance regulations were more stringent than federal MCLs, then the ROD selected the state values as the cleanup goals. ARARs from the 1992 ROD were compared to current National Primary Drinking Water Regulations (40 CFR 141-143) and Florida MCLs (FAC 62-550) and Florida GCTLs (FAC 62-777) (Table 6). No current federal or state MCLs exist for 1,1-DCA, dichlorodifluoromethane or trichlorofluoromethane, so Florida GCTLs were used as current State ARARs for these contaminants.

**Table 6: Previous and Current Chemical-specific ARARs for Groundwater COCs**

| COC | 1992 ROD ARARs (µg/L) | Current Groundwater Standards (µg/L) | Standards Changed? |
|---|---|---|---|
| 1,1-DCA | 2,400[a] | 70[d] | More Stringent |
| 1,1-DCE | 7[b] | 7[e] | None |
| Cis-1,2-DCE | 70[b] | 70[e] | None |
| TCE | 3[b] | 3[f] | None |
| PCE | 3[b] | 3[f] | None |
| Vinyl chloride | 1[b] | 1[f] | None |
| 1,1,1-Trichloroethane | 200[a] | 200[e] | None |
| 1,1,2-Trichloroethane | 5[a] | 5[e] | None |
| Di (2-ethylhexyl) phthalate | 4[a] | 6[e] | Less Stringent |
| Dichlorodifluoromethane | 1,400[b] | 1,400[d] | None |
| Trichlorofluoromethane | 2,400[b] | 2,100[d] | More Stringent |
| 1,4-Dioxane | --[c] | 3.2[d] | New |

*Notes:*
a. State MCL listed in the 1992 ROD.
b. Federal MCL listed in the 1992 ROD.
c. 1,4-Dioxane was not identified as a COC in the 1992 ROD but the EPA and FDEP required that the PRP include it as a potential COC starting in the third quarter of 2010.
d. Current ARAR value based on Florida GCTLs, available at: https://floridadep.gov/sites/default/files/62-777-TechRprt-Table1-Groundwater-CTLs_Feb2005.xlsx (accessed 09/23/19).
e. Current ARAR value based on federal MCLs (40 CFR 141-143). National primary and secondary drinking water MCLs are available at: https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (accessed 9/23/2019).
f. Current ARAR value based on state MCLs listed in FDEP drinking water standards, monitoring and reporting (62 FAC 550.828). Florida state drinking water volatile organic compound levels are available at: https://www.flrules.org/gateway/notice_Files.asp?ID=17870715 (accessed 9/23/2019).

Current Florida GCTLs indicates that ARARs for 1,1-DCA and trichlorofluoromethane (both 2,400 µg/L) have become more stringent: 70 µg/L and 2,100 µg/L, respectively. The current monitoring reports have adopted the more-stringent values for evaluating plume trends and will continue to do so in future evaluations and monitoring reports. In addition, the most current data indicates that trichlorofluoromethane is below detection in all wells sampled. The ARAR for di (2-ethylhexyl) phthalate has become less stringent, with the federal MCL changing from 4 µg/L to 6 µg/L. All monitoring reports identified 1,4-Dioxane as a potential COC in 2010 and monitoring results during the 2020 FYR period indicate the concentrations in several wells exceed the established GCTL of 3.2 µg/L; therefore, this AROD is formally including 1,4-dioxane as a Site COC. ARARs for the remaining COCs remain unchanged.

Tables 1 and 2 in Appendix F list respectively the chemical-specific and action-specific ARARs/TBCs for the remedy selected in this AROD. There are no location-specific ARARs.

The remedy selected in this AROD will adhere to the Remedial Action Objectives (RAOs) set forth in the 1992 ROD which are to:

- Prevent the near-term and future exposure of human receptors to contaminated groundwater both on and off the Site.
- Minimize the migration of contamination from the landfill to the surrounding community.
- Restore the groundwater to drinking water quality for the Contaminants of Concern (COCs).
- Monitor groundwater in a manner that will verify the effectiveness of the selected remedy.

For groundwater, per the EPA groundwater policy, remediation levels should generally be attained throughout the contaminated plume, or at and beyond the edge of the waste management area when waste is left in place. Since the contaminated landfill waste has been capped in place at the MCSL Site and constitutes a waste management area, any dissolved phase plume located under the engineered cap does not require restoration to attain drinking water standards. Only groundwater located outside of the capped area is being addressed with this amended remedy.

### 6.5 Estimated Cost of the Selected Amended Remedy

The estimated total net present worth cost for the selected amended remedy is $6,583,000. Optional ISCO hotspot treatment accounts for $1,035,000 of the total cost. A breakdown of this cost estimate is provided in Table 7.

### 6.6 Estimated Outcomes of the Selected Amended Remedy

The Site is currently in use for industrial/commercial purposes. Future land use of the Site property is anticipated to continue to be industrial/commercial.

The amended remedy is anticipated to achieve the final cleanup levels for groundwater COCs shown in Table 6.

## 7.0 State Acceptance

State acceptance indicates whether the state supports, opposes, and/or has identified any reservations with the selected response measure based on its review of the RI/FS reports and the Proposed Plan.

FDEP has been involved actively in the process of determining and evaluating the Madison County Sanitary Landfill Site cleanup alternatives. FDEP has expressed support for the selected amended remedy which includes enhanced reductive dechlorination, performance monitoring, and optional in-situ chemical oxidation hot-spot treatment in its review of the ROD Amendment (Appendix D). It is anticipated that FDEP will concur with the selected amended remedy for groundwater via a concurrence letter.

## 8.0 Statutory Determinations

The selected amended remedy in this AROD for treatment of contaminated groundwater is protective of human health and the environment, is cost effective, and it complies with Federal and more stringent State requirements that are legally applicable or relevant and appropriate to the remedial action. This remedy utilizes permanent solutions and alternative treatment technologies to the maximum extent practicable and satisfies the statutory preference for remedies that employ treatment that reduces toxicity, mobility, or volume as a principal element.

### 8.1 Protection of Human Health and the Environment

The selected amended remedy [Alternative 3: Phased ERD with Supplemental Amendments Followed by Performance Monitoring and Optional ISCO Hotspot Treatment for 1,4-Dioxane] will protect human health and the environment through the in-situ treatment of groundwater COCs utilizing phased ERD with supplemental amendments as needed and optional ISCO hotspot treatment for 1,4-dioxane. These treatment components may be optimized during remedy implementation in order to achieve the RAOs and attain cleanup levels within a reasonable timeframe. Groundwater monitoring will be implemented and used to assess performance of the in-situ treatments in view of reducing COCs at a rate that can attain cleanup levels throughout the plume. ICs that have already been implemented to prevent use of and exposure to contaminated groundwater will continue until the RAOs have been achieved and cleanup levels met.

### 8.2 Compliance with ARARs

Section 121(d) of CERCLA, as amended, specifies, in part, that remedial actions for cleanup of hazardous substances must comply with requirements and standards under federal or more stringent state environmental laws and regulations that are applicable or relevant and appropriate (i.e., ARARs) to the hazardous substances or particular circumstances at a site or justify invoking a waiver under Section 121(d)(4). See also 40 C.F.R. §§ 300.430(f)(1)(ii)(B) and (C), and 40 C.F.R. §§ 300.430(f)(5)(ii)(B) and (C). ARARs include only federal and state environmental or facility siting laws/regulations and do not include occupational safety or worker protection requirements. Compliance with OSHA standards is required by 40 C.F.R. § 300.150 and therefore the CERCLA requirement for compliance with or wavier of ARARs does not apply to OSHA standards.

Under CERCLA Section 121(e)(1), federal, state, or local permits are not required for the portion of any removal or remedial action conducted entirely on-site as defined in 40 C.F.R. § 300.5. See also 40 C.F.R. §§ 300.400(e)(1) & (2). Also, CERCLA actions must comply only with the "substantive requirements," not the administrative requirements of a regulation or law. Administrative requirements include permit applications, reporting, record keeping, and consultation with administrative bodies. Although consultation with state and federal agencies responsible for issuing permits is not required, it is recommended for determining compliance with certain requirements such as those typically identified as Location-Specific ARARs.

In addition to ARARs, the lead and support agencies may, as appropriate, identify other advisories, criteria, or guidance to be considered for a particular release. The "to-be-considered" (TBC) category consists of advisories, criteria, or guidance that were developed by the EPA, other federal agencies, or states that may be useful in developing CERCLA remedies. See 40 C.F.R. § 300.400(g)(3).

Tables 1 and 2 in Appendix F list respectively the chemical-specific and action-specific ARARs/TBCs for the selected amended remedy.

### 8.3 Cost-Effectiveness

The EPA has determined that the selected amended remedy is cost effective, and that the overall protectiveness of the remedy is proportional to the overall cost. As specified in 40 CFR § 300.430(f)(1)(ii)(D), the cost effectiveness of the selected amended remedy was assessed by comparing

the protectiveness of human health and the environment in relation to three balancing criteria (long-term effectiveness and permanence, reduction in toxicity, mobility, and volume, and short-term effectiveness), with the other alternatives considered.

While more than one remedial alternative can be considered cost effective, CERCLA does not mandate the selection of the most cost-effective or least-expensive remedy.

### 8.4. Utilization of Permanent Solutions and Alternative Treatment Technologies to the Maximum Extent Practicable

The EPA has determined that the selected amended remedy represents the maximum extent to which permanent solutions and treatment technologies can be utilized in a practicable manner at the Site. When comparing the remedial options (i.e., Alternative 1: No Action, Alternative 2: ISCO, and Alternative 3: Phased ERD with Supplemental Amendments Followed by Performance Monitoring and Optional ISCO Hotspot Treatment for 1,4-Dioxane), Alternatives 2 and 3 are both protective of human health and the environment and would comply with ARARs. However, Alternative 3: ERD with Supplemental Amendments Followed by Performance Monitoring and Optional ISCO Hotspot Treatment for 1,4-Dioxane, the selected amended remedy, provides the best balance of trade-offs in terms of long-term effectiveness and permanence, short-term effectiveness, implementability, and cost. Additionally, ERD has been piloted at the Site and showed evidence of reduced COC concentrations.

The selected amended remedy will treat CVOC contamination and achieve reduction in toxicity, mobility, and volume through in-situ treatment of the source area contaminants.

Groundwater monitoring and ICs are critical components to ensure that the selected amended remedy is protective and will achieve RAOs. The amended groundwater remedy represents a permanent solution to address the risks posed at the Site and restore groundwater to beneficial use.

### 8.5. Five-Year Review Requirements

Because this remedy will result in hazardous substances, pollutants, or contaminants remaining on the Site above levels that would allow for unlimited use and unrestricted exposure, per CERCLA Section 121© and NCP at 40 CFR § 300.430(f)(5)(iii)(C) a statutory review has been and will continue to be conducted every five years after initiation of the remedial action to ensure that the remedy remains protective of human health and the environment, inclusive of the implemented ICs. If results of the five-year reviews reveal that remedy integrity is compromised and protection of human health is insufficient, then additional remedial actions will be evaluated by the EPA and FDEP. The statutory five-year reviews will be conducted in accordance with EPA policy and guidance.

## 9.0 Public Participation Compliance

Public participation requirements in the NCP at 40 C.F.R.300.43(c)(2)(ii) were met as part of the ROD Amendment preparation process. The notice of availability of the AR and the EPA's Proposed Plan to amend the ROD for the groundwater portion of the Sitewide remedy was published in the *Madison Enterprise-Recorder* on December 10, 2021.

Due to state and local COVID-19 restrictions and guidance from the Centers of Disease Control and Prevention regarding public gathering at the time, the EPA posted a pre-recorded presentation on the Site Profile Page (https://www.epa.gov/superfund/madison-county-sanitary-landfill) and YouTube. The recorded video presentation, which could be watched at any time during the public comment period, presented to the public the groundwater remedial alternatives considered as well as the Preferred Alternative featured in the Madison County Sanitary Landfill Site Proposed Plan. Additionally, the EPA engaged the local community by mailing out fact sheets summarizing the EPA's new preferred remedial alternative for the Site to nearby addresses and local government stakeholders.

Other Site-related documents relevant to the Madison County Sanitary Landfill Site Proposed Plan and this AROD, including but not limited to the Feasibility Study and the pilot ERD injection sampling report, were made available to the public and placed in the AR. The AR, which was compiled in accordance with Section 113(k)(1) of CERCLA, 42 U.S.C. § 9613(k)(1) and expanded pursuant to 40 C.F.R. 300.435(c)(2)(ii), can be found online at https://www.epa.gov/superfund/madison-county-sanitary-landfill or examined at the Site Repository located at the North Florida College Library, 325 NW Turner Davis Drive Madison, Florida 32340.

From December 15, 2021, to January 14, 2021, the EPA held a 60-day public comment period to accept public comments via email, letter, and voicemail on the remedial alternatives presented in the Madison County Sanitary Landfill Proposed Plan to amend the groundwater remedy of the Sitewide 1992 ROD. No comments were received during the 60-day public comment period.

# FIGURES

# FIGURE 1: SITE VICINITY




Disclaimer: This map and any boundary lines within the map are approximate and subject to change. The map is not a survey. The map is for informational purposes only regarding the EPA's response actions at the Site.

# FIGURE 2: CURRENT MONITORING WELL NETWORK




*Disclaimer:* This map and any boundary lines within the map are approximate and subject to change. The map is not a survey. The map is for informational purposes only regarding the EPA's response actions at the Site.

# FIGURE 3: 1,4-DIOXANE TRENDS IN THE YTA IN OLDER WELLS




# TABLE 3: 1,4-DIOXANE TRENDS IN THE YTA IN NEWER WELLS

| Contaminant | Southern YTA (µg/L) | | Southwest and Downgradient of YTA (µg/L) | | | |
|---|---|---|---|---|---|---|
| 1,4-Dioxane | IT20S | 12U (9/2019) | IT22S | 230 (9/2019) | IT22LS | 180 (9/2019) |
| | | 5.4J(3/2019) | | 780J (3/2019) | | 130J (3/2019) |
| | | 70J (9/2018) | | 410 (9/2018) | | 220 (9/2018) |
| | | 15J (3/2017) | | 640 (3/2018) | | Not sampled |
| | | 12J (9/2017) | | 660J (9/2017) | | 93 (9/2017) |
| | | 9.3J (3/2017) | Well not yet installed | | Well not yet installed | |
| | | 5.6J (10/2016) | | | | |

*Notes:*
U - Below detection. Detection limit listed.
J – Estimated value.
Source: Semi-Annual Monitoring Report 3rd Quarter 2019. Prepared by MES Group, LLC. December 2019.




FIGURE 4

GEOLOGIC AND CVOC DISTRIBUTION CROSS SECTION A - A' NORTHWEST CORNER of YTA

FORMER MADISON COUNTY LANDFILL
MADISON, FLORIDA

SEPTEMBER 2020

NOTE:
SONIC AND DPT DATA COLLECTED IN NOVEMBER 2011 (PHASE 1) JUNE 2012 (PHASE 2) AND MARCH 2014 (PHASE 3)

MSE GROUP



FIGURE 5
MAP FEATURES
MONITORING WELL
PEIZOMETER
DPT SAMPLE LOCATION
DPT SAMPLE LOCATION WITH MEMBRANE INTERFACE PROBE
SECURITY FENCE
ESTIMATED EXTENT OF CVOCs > 10x NADC CONTOUR LINE
ESTIMATED LIMITS OF PALEOSINK
ESTIMATED EXTENT OF CVOCs > NADC CONTOUR LINE
ESTIMATED EXTENT OF CVOCs > GCTL CONTOUR LINE
NORTHWEST CORNER CONTAMINANT ISOCONTOURS
FORMER MADISON COUNTY LANDFILL MADISON,FLORIDA
SEPTEMBER 2020
BACKGROUND IMAGE SOURCE; REMEDIAL ACTION CONSTRUCTION REPORT GOLDER ASSOCIATES INC. FEBRUARY 1997
SURVEY IMAGE SOURCE; SOUTHEASTERN SURVEYING, INC. APRIL 2014
NOTE: SONIC AND DPT DATA COLLECTED IN NOVEMBER 2011 (PHASE 1) JUNE 2012 (PHASE 2) MARCH 2014 (PHASE 3) AND DECEMBER 2015 (PHASE 4)
60' 0 60'
MSE GROUP
APPROXIMATELY 2.27 ACRES
APPROXIMATELY 0.65 ACRE
APPROXIMATELY 0.14 ACRE
SG1
DP40
DP41 (SONIC 03)
DP13
DP23
DP24
DP29
DP31
DP32
DP14
DP42
DP 15
CHAIN LINK FENCE
YTA-1
DP30
DP33
DP11
IT 19DD
IT 19I
DP12
DP25
SONIC 02
DP09
DP26
DP10
IT 19LS
IT 19US
DP39
DP37
DP34
DP43
YTA 2
RIP RAP
DP36
DP35
DP38
DP28
DP27
DP44 (SONIC 06)
DP45
DP08
PZY1
DP07

# FIGURE 6







PARTIAL PLAN
NOT TO SCALE

GEOLOGIC AND CVOC DISTRIBUTION CROSS SECTION B - B' (SOUTHEAST CORNER OF YTA)
FORMER MADISON COUNTY LANDFILL
MADISON,FLORIDA

SEPTEMBER 2020

NOTE:
SONIC AND DPT DATA COLLECTED IN
NOVEMBER 2011 (PHASE 1)
JUNE 2012 (PHASE 2)
MARCH 2014 (PHASE 3)
DECEMBER 2015 (PHASE 4)

MSE GROUP




FIGURE 7

MAP FEATURES

- MONITORING WELL
- PEIZOMETER
- DPT SAMPLE LOCATION
- SECURITY FENCE
- ESTIMATED EXTENT OF CVOCs > 10x NADC CONTOUR LINE
- ESTIMATED LIMITS OF PALEOSINK
- ESTIMATED EXTENT OF CVOCs > NADC CONTOUR LINE
- ESTIMATED EXTENT OF CVOCs > GCTL CONTOUR LINE

SOUTHEAST CORNER CONTAMINANT ISOCONTOURS

FORMER MADISON COUNTY LANDFILL
MADISON, FLORIDA
SEPTEMBER 2020

BACKGROUND IMAGE SOURCE;
REMEDIAL ACTION CONSTRUCTION REPORT
GOLDER ASSOCIATES INC.
FEBRUARY 1997

SURVEY IMAGE SOURCE;
SOUTHEASTERN SURVEYING, INC.
APRIL 2014

NOTE:
SONIC AND DPT DATA COLLECTED IN
NOVEMBER 2011 (PHASE 1)
JUNE 2012 (PHASE 2)
MARCH 2014 (PHASE 3)
DECEMBER 2015 (PHASE 4)

60' 0 60'

MSE GROUP


FIGURE 8
MAP FEATURES
MONITORING WELL
PEIZOMETER
DPT SAMPLE LOCATION
SECURITY FENCE
ESTIMATED EXTENT OF CVOC's > NADC CONTOUR LINE
ESTIMATED EXTENT OF CVOC's > 10X NADC CONTOUR LINE
ESTIMATED EXTENT OF CVOC's > GCTL CONTOUR LINE
SOUTHWEST CORNER CONTAMINANT ISOCONTOURS
FORMER MADISON COUNTY LANDFILL
MADISON, FLORIDA
SEPTEMBER 2020
BACKGROUND IMAGE SOURCE;
REMEDIAL ACTION CONSTRUCTION REPORT
GOLDER ASSOCIATES INC.
FEBRUARY 1997
SURVEY IMAGE SOURCE;
SOUTHEASTERN SURVEYING, INC.
APRIL 2014
NOTE:
SONIC AND DPT DATA COLLECTED IN
NOVEMBER 2011 (PHASE 1)
JUNE 2012 (PHASE 2)
MARCH 2014 (PHASE 3)
DECEMBER 2015 (PHASE 4)
MAY 2018 (PHASE 5)
70'
0
70'
MSE GROUP
DP07
DP06
DP63
APPROXIMATELY 2.96 ACRES
DP05
DP72
DP65
DP71
IT21S
IT21LS
DP64
DP74
PZY2
YTA 3
RW3
IT22S
IT22LS
RW3R
DP73
APPROXIMATELY 0.28 ACRE
APPROXIMATELY 1.14 ACRE
DP75
DP76
DP77
IT 15S
IT 15LS




FIGURE 9

MAP FEATURES

- MONITORING WELL
- PEIZOMETER
- DPT SAMPLE LOCATION
- DPT SAMPLE LOCATION WITH MEMBRANE INTERFACE PROBE
- PHASE I TREATMENT AREA
- PHASE II HOTSPOT TREATMENT AREA
- SECURITY FENCE
- ESTIMATED EXTENT OF CVOCs > 10x NADC CONTOUR LINE
- ESTIMATED LIMITS OF PALEOSINK
- ESTIMATED EXTENT OF CVOCs > NADC CONTOUR LINE

## NORTHWEST CORNER ALTERNATIVE II, III: TREATMENT AREA

## FORMER MADISON COUNTY LANDFILL MADISON, FLORIDA

SEPTEMBER 2020

BACKGROUND IMAGE SOURCE;
REMEDIAL ACTION CONSTRUCTION REPORT
GOLDER ASSOCIATES INC.
FEBRUARY 1997

SURVEY IMAGE SOURCE;
SOUTHEASTERN SURVEYING, INC.
APRIL 2014

NOTE:
SONIC AND DPT DATA COLLECTED IN
NOVEMBER 2011 (PHASE 1)
JUNE 2012 (PHASE 2)
MARCH 2014 (PHASE 3)
DECEMBER 2015 (PHASE 4)

60' 0 60'

MSE GROUP




# FIGURE 10

MAP FEATURES

- MONITORING WELL
- PEIZOMETER
- DPT SAMPLE LOCATION
- PHASE I TREATMENT AREA
- PHASE II HOTSPOT TREATMENT AREA
- SECURITY FENCE
- ESTIMATED EXTENT OF CVOCs > 10x NADC CONTOUR LINE
- ESTIMATED LIMITS OF PALEOSINK
- ESTIMATED EXTENT OF CVOCs > NADC CONTOUR LINE

## SOUTHEAST CORNER ALTERNATIVE II, III: TREATMENT AREA

## FORMER MADISON COUNTY LANDFILL MADISON,FLORIDA

SEPTEMBER 2020

BACKGROUND IMAGE SOURCE;
REMEDIAL ACTION CONSTRUCTION REPORT
GOLDER ASSOCIATES INC.
FEBRUARY 1997

SURVEY IMAGE SOURCE;
SOUTHEASTERN SURVEYING, INC.
APRIL 2014

NOTE:
SONIC AND DPT DATA COLLECTED IN
NOVEMBER 2011 (PHASE 1)
JUNE 2012 (PHASE 2)
MARCH 2014 (PHASE 3)
DECEMBER 2015 (PHASE 4)

60' 0 60'

MSE GROUP




FIGURE 11

MAP FEATURES

- MONITORING WELL
- PEIZOMETER
- DPT SAMPLE LOCATION
- PHASE I TREATMENT AREA
- PHASE II HOTSPOT TREATMENT AREA
- SECURITY FENCE
- ESTIMATED EXTENT OF CVOC's > NADC CONTOUR LINE
- ESTIMATED EXTENT OF CVOC's > 10X NADC CONTOUR LINE

SOUTHWEST CORNER ALTERNATIVE II, III: TREATMENT AREA

FORMER MADISON COUNTY LANDFILL MADISON,FLORIDA

SEPTEMBER 2020

BACKGROUND IMAGE SOURCE;
REMEDIAL ACTION CONSTRUCTION REPORT
GOLDER ASSOCIATES INC.
FEBRUARY 1997

SURVEY IMAGE SOURCE;
SOUTHEASTERN SURVEYING, INC.
APRIL 2014

NOTE:
SONIC AND DPT DATA COLLECTED IN
NOVEMBER 2011 (PHASE 1)
JUNE 2012 (PHASE 2)
MARCH 2014 (PHASE 3)
DECEMBER 2015 (PHASE 4)
MAY 2018 (PHASE 5)

70' 0 70'

MSE GROUP

# FIGURE 12: INSTITUTIONAL CONTROL AND GROUNDWATER CVOC PLUME MAP




*Disclaimer:* This map and any boundary lines within the map are approximate and subject to change. The map is not a survey. The map is for informational purposes only regarding the EPA's response actions at the Site.

# APPENDICES

# APPENDIX A: ADMINISTRATIVE RECORD INDEX

12/09/2021 12:54 PM

Administrative Record Index
For The
MADISON COUNTY SANITARY LANDFILL NPL Site
(Amendment to Record of Decision)
FLD981019235

**4.0 FEASIBILITY STUDY (FS)**

**4. 9 Feasibility Study (FS) Reports**

1. "Focused Feasibility Analysis for 1,4-Dioxane Treatment Alternatives, Former Madison County Landfill Site, Madison, Florida," 3E Consultants. (March 1, 2011)
2. "Focused Feasibility Study for 1,4-Dioxane Treatment Alternatives, Madison County Sanitary Landfill, Madison, Florida," 3E Consultants. (November 15, 2013)
3. "Feasibility Study, Revision 3, Former Madison County Landfill Site, Madison, Florida," MSE Group. (December 2021)

**4.10 Proposed Plans for Selected Remedial Action**

1. "Superfund Proposed Plan, Groundwater Remedy, Madison County Sanitary Landfill Site, Madison, Madison County, Florida," USEPA. (December 2021)

**5.0 RECORD OF DECISION (ROD)**

**5. 9 Record of Decision (ROD)**

1. "Record of Decision, Madison County Landfill Site, Madison, Madison County, Florida," USEPA. (September 28, 1992)

**7.0 REMEDIAL ACTION (RA)**

**7. 1 Correspondence**

1. Letter Dennis Theoret, 3E Consultants to Joseph Alfano, USEPA. Subject: Response to Comment Summary, Former Madison County Landfill. (May 13, 2015)
2. Email from John Sykes, Florida Department of Environmental Protection (FDEP) to Joseph Alfano, USEPA. Subject: Technical Comments on Madison ERD. (8:40 am). (May 17, 2017)
3. Email from John Sykes, FDEP to Joseph Alfano, USEPA. Subject: Comments on Madison County Report. (8:57 am). (June 26, 2017)
4. Email from Joseph Alfano, USEPA to Addressees. Subject: FW: Comments on ERD Work Plan and Proposed YTA Wells - Madison County Landfill. (3:38 pm). (July 6, 2017)
5. Memorandum from Katherine Schroer, USEPA to Joe Alfano, USEPA. Subject: Review of Additional Well Installations in the Yard Trash Area (YTA) Investigation. (July 6, 2017)
6. Email from Joseph Alfano, USEPA to Lisa Hall, ITT. Subject: Madison County Landfill Monitoring Well Abandonment Reply. (2:46 pm). (August 10, 2017)
7. Memorandum from Ben Bentkowski, USEPA to Joseph Alfano, USEPA. Subject: Comments on the Enhanced Reductive Dechlorination Pilot Post Injection Performance Monitoring Letter Report - December 20, 2019. (February 18, 2020)

12/09/2021 12:54 PM

Administrative Record Index
For The
MADISON COUNTY SANITARY LANDFILL NPL Site
(Amendment to Record of Decision)
FLD981019235

**7. 2 Sampling and Analysis Data**

1. Memorandum from David Jenkins, USEPA to Joe Alfano, USEPA. Subject: 2011 2nd Qtr Monitoring Report and 2011 3rd Qtr Monitoring Report. (February 8, 2012)

2. Memorandum from Linda George, USEPA to Joe Alfano, USEPA. Subject: Oversight of Groundwater Sampling. (March 4, 2014)

3. Memorandum from Zoe Kulakowski, FDEP to John Sykes, FDEP. Subject: Quarterly Monitoring Report, Second Quarter 2015, WC-SF: 000000076. (September 17, 2015)

4. Email from Kyle Eden, MSE Group to Jasmin Jefferies, USEPA. Subject: Former Madison County Landfill - ERD Pilot Test Post Injection Performance Monitoring Report. (11:40 am). (December 30, 2019)

**7. 4 Work Plans and Progress Reports**

1. Letter from Dennis Theoret, 3E Consultants, Inc. to Joe Alfano, USEPA. Subject: Investigation Work Plan for the Yard Trash Area, Former Madison County Landfill, Madison, Florida. (January 28, 2011)

2. Email from Joe Alfano, USEPA to Paul Seavy, 3E Consultants, Inc. Subject: Madison County Landfill Additional Source Work Plan. (4:58 pm). (February 7, 2011)

3. Letter from Dennis Theoret, 3E Consultants, Inc. to Joe Alfano, USEPA. Subject: Investigation Work Plan for the Yard Trash Area, Former Madison County Landfill, Madison, Florida. (March 11, 2011)

4. Letter from Dennis Theoret, 3E Consultants, Inc. to Joe Alfano, USEPA. Subject: Performance Standards Verification Plan Addendums, Investigation Work Plan for the Yard Trash Area Former Madison County Landfill. (April 14, 2011)

5. Letter from Dennis Theoret, 3E Consultants, Inc. to Joe Alfano, USEPA. Subject: Investigation Work Plan for the Yard Trash Area - Revision #2, Former Madison County Landfill, Madison, Florida. (April 19, 2011)

6. Letter from Paul Seavy, 3E Consultants to Joe Alfano, USEPA. Subject: Bench-Scale Pilot Treatability Study Work Plan for AOP Treatment of 1,4-Dioxane. (July 15, 2011)

7. Letter from Dennis Theoret, 3E Consultants, Inc. to Joe Alfano, USEPA. Subject: Investigation Work Plan for the Yard Trash Area - Revision #3, Former Madison County Landfill, Madison, Florida. (August 1, 2011)

8. Memorandum from David Jenkins, USEPA to Joe Alfano, USEPA. Subject: Treatability Study Work Plan for AOP Treatment of 1,4-Dioxane for the Former Madison County Landfill. (August 27, 2012)

9. "Advanced Oxidation Process Design and Implementation Work Plan for 1,4-Dioxane Treatment, Madison County Sanitary Landfill, Madison, Florida," 3E Consultants. (January 30, 2014)

Administrative Record Index
For The
MADISON COUNTY SANITARY LANDFILL NPL Site
(Amendment to Record of Decision)
FLD981019235

10. Letter from Dennis Theoret, 3E Consultants to Joseph Alfano, USEPA. Subject: Work Plan Addendum for the Yard Trash Area (YTA), Inside YTA Fence Line, Former Madison County Landfill. (May 13, 2015)

11. Letter from Dennis Theoret, 3E Consultants to Joe Alfano, USEPA. Subject: Re: Proposed Groundwater Sampling Plan Former Madison County Landfill Madison, Florida. (August 29, 2016)

12. "Ground Water Enhanced Reductive Dechlorination Pilot Test Work Plan, Yard Trash Area, Former Madison County Landfill Site, Madison, Florida," MSE Group. (April 28, 2017)

13. Email from Kyle Eden, MSE Group to Joe Alfano, USEPA. Subject: Former Madison County Landfill Site – GW ERD Pilot Test Work Plan Addendum No. 1. (2:26 pm). (September 21, 2017)

**7. 7 Applicable or Relevant and Appropriate Requirements (ARARs)**

1. Letter from John Sykes, FDEP to Joe Alfano, USEPA. Subject: Applicable or Relevant and Appropriate Requirements (ARARS) Identification Request. (May 10, 2013)

2. Email from David Buxbaum, USEPA To Addressees. Subject: Re: Madison County Sanitary Landfill ARARS. (11:17 am). (February 2, 2021)

**7. 8 Remedial Action Documents**

1. Memorandum from Art Masters, USEPA to Joe Alfano, USEPA. Subject: Madison County Landfill Overview, Madison, Florida. (December 14, 2011)

2. "Bench-Scale Pilot Treatability Study Report for Advanced Oxidation Process (AGP) Treatment of 1,4-Dioxane, Former Madison County Landfill Site, Madison, Florida," 3E Consultants. (July 31, 2012)

3. "Yard Trash Area (YTA) Investigation Report, Former Madison County Landfill, Madison, Florida," 3E Consultants. (March 19, 2013)

4. "Yard Trash Area (YTA) Investigation Report, Former Madison County Landfill, Madison, Florida," 3E Consultants. (June 27, 2013)

5. "Yard Trash Area (YTA) Investigation Report, Former Madison County Landfill, Madison, Florida," 3E Consultants. (August 22, 2014)

6. Letter from Dennis Theoret, 3E Consultants To Joseph Alfano, USEPA. Subject: Yard Trash Area (YTA) Investigation Report, Addendum No. 1, Former Madison County Landfill. (May 13, 2015)

7. Letter from Dennis Theoret, MSE Group to Joseph Alfano, USEPA. Subject: Enhanced Reductive Dechlorination Pilot Test Implementation Summary Letter Report. (June 15, 2018)

8. Memorandum from Lanita Walker, FDEP To John Sykes, FDEP. Subject: Enhanced Reductive Dechlorination (ERD) Pilot Test Implementation Summary Letter Report. (July 18, 2018)

12/09/2021 12:54 PM

Administrative Record Index
For The
MADISON COUNTY SANITARY LANDFILL NPL Site
(Amendment to Record of Decision)
FLD981019235

9. Memorandum from Elena Compton, FDEP To John Sykes, FDEP. Subject: Former Madison County Landfill Site (Yard Trash Area), Technical Update to the Enhanced Reductive Dechlorination, Underground Injection Control Sampling Summary Report dated May 16, 2019. (June 17, 2019)

## 13.0 COMMUNITY RELATIONS

### 13. 9 Fact Sheets

1. "Proposed Plan Fact Sheet, Madison County Sanitary Landfill, Madison County, Florida," USEPA. (December 2021)

# APPENDIX B – CITY AND COUNTY ORDINANCES

## City of Madison Ordinance 2001-6

ORDINANCE NO. 2001-6

AN ORDINANCE OF THE CITY OF MADISON, FLORIDA, AMENDING ORDINANCE NO. 91-6, AS AMENDED, RELATING TO AN AMENDMENT TO THE TEXT OF THE CITY OF MADISON COMPREHENSIVE PLAN, UNDER THE REGULAR AMENDMENT PROCEDURES ESTABLISHED IN SECTIONS 163.3161 THROUGH 163.3215, FLORIDA STATUTES; ADDING OBJECTIVE IV.8, POLICY IV.8.1, POLICY IV.8.2 AND POLICY IV.8.3 CONCERNING LIMITATIONS ON WATER WELLS AND EXCAVATION AT THE MADISON COUNTY SANITARY LANDFILL SUPERFUND SITE; REPEALING ALL ORDINANCES IN CONFLICT; AND PROVIDING AN EFFECTIVE DATE

WHEREAS, Section 166.021, Florida Statutes, empowers the City Commission of the City of Madison, Florida, hereinafter referred to as the City Commission, to prepare, adopt and implement a comprehensive plan;

WHEREAS, Sections 163.3161 through 163.3215, Florida Statutes, the Local Government Comprehensive Planning and Land Development Regulation Act, empowers and requires the City Commission to prepare, adopt and implement a comprehensive plan;

WHEREAS, an application for an amendment, as described below, has been filed with the City;

WHEREAS, the Planning and Zoning Board of the City of Madison, Florida, hereinafter referred to as the Planning and Zoning Board, has been designated as the City of Madison Local Planning Agency of the City of Madison, Florida, hereinafter referred to as the Local Planning Agency;

WHEREAS, pursuant to Section 163.3174, Florida Statutes, and the City of Madison Land Development Regulations, hereinafter referred to as the Land Development Regulations, the Planning and Zoning Board, serving also as the Local Planning Agency, held the required public hearing, with public notice having been provided, on said application for an amendment, as described below, and at said public hearing, the Planning and Zoning Board, serving also as the Local Planning Agency, reviewed and considered all comments received during said public hearing concerning said application for an amendment, as described below, and recommended to the City Commission approval of said application for amendment, as described below;

WHEREAS, the City Commission held two public hearings, with public notice having been provided, under the procedures established in Sections 163.3161 to 163.3215, Florida Statutes, on said application for amendment, as described below, and at said public hearings, the City Commission reviewed and considered all comments received during said public hearings, including the recommendation of the Planning and Zoning Board, serving also as the Local Planning Agency, concerning said application for an amendment, as described below;

WHEREAS, the City Commission found said application for an amendment, as described below, to be compatible with the Land Use Element objectives and policies, and those of other affected elements of the Comprehensive Plan; and

WHEREAS, the City Commission has determined and found that approval of said application for an amendment, as described below, would promote the public health, safety, morals, order, comfort, convenience, appearance, prosperity or general welfare.

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COMMISSION OF THE CITY OF MADISON, FLORIDA, AS FOLLOWS:

Section 1. Pursuant to an application, CPA 01-2, by the City Commission, to amend the text of the Sanitary Sewer, Solid Waste, Drainage, Potable Water and Natural Aquifer Recharge Element of the Comprehensive Plan by adding Objective IV.8, Policy IV.8.1, Policy IV.8.2 and Policy IV.8.3 concerning limitations on water wells and excavation at the Madison County Sanitary Landfill Superfund Site, Objective IV.8, Policy IV.8.1, Policy IV.8.2 and Policy IV 8.3 are hereby added to read, as follows:

Objective IV.8 The City shall establish limitations concerning water wells and excavation in conformance with the Remedial Action Construction Report for the Madison County Sanitary Landfill Superfund Site located on Rocky Ford Road.

Policy IV.8.1 Water wells shall not be installed on the Madison County Sanitary Landfill Superfund Site located on Rocky Ford Road for any purpose other than groundwater monitoring or groundwater remediation.

Policy IV.8.2 Construction requiring excavation shall be prohibited within the lands identified as the Madison County Sanitary Landfill Superfund Site located on Rocky Ford Road. The only exception for any excavation to be permitted on the site will be for constructing additions or enhancements to the remediation system identified in the Remedial Action Construction Report for the site.

Policy IV.8.3 Any and all construction for additions or enhancements to the remediation system for the Madison County Sanitary Landfill Superfund Site located on Rocky Ford Road shall be conducted by firms that have experience with the handling of hazardous material.

Section 2. Severability. If any provision or portion of this ordinance is declared by any court of competent jurisdiction to be void, unconstitutional or unenforceable, then all remaining provisions and portions of this ordinance shall remain in full force and effect.

Section 3. Conflict. All ordinances or parts of ordinances in conflict herewith are, to the extent of such conflict, hereby repealed.

Section 4. Effective Date. This ordinance shall become effective upon adoption.

The effective date of this plan amendment shall be the date a final order is issued by the Florida Department of Community Affairs finding the amendment in compliance in accordance with Section 163.3184, Florida Statutes; or the date a final order is issued by the Florida Administration Commission finding the amendment in compliance in accordance with Chapter 163.3184, Florida Statutes. Further, the Department's notice of intent to find a plan amendment in compliance shall be deemed to be a final order if no timely petition challenging the amendment is filed. Any affected person may file a petition with the agency within twenty-one (21) days after the publication of the notice pursuant to Chapter 163.3184(9), Florida Statutes. No development orders, development permits or land uses dependent on this amendment may be issued or commence before it has become effective. If a final order of noncompliance is issued, this amendment may nevertheless be made effective by adoption of a resolution affirming its effective status, a copy of which resolution shall be sent to the Florida Department of Community Affairs, Division of Community Planning, Bureau of Local Planning, Plan Processing Team, 2555 Shumard Oak Boulevard, Tallahassee, Florida 32399-2100.

Section 5. Authority. This ordinance is adopted pursuant to the authority granted by Section 166.021, Florida Statutes, and Sections 163.3161 through 163.3215, Florida Statutes.

PASSED upon first reading this 8th day of May 2001.

PASSED AND DULY ADOPTED upon second read and final reading with a quorum present and voting by the City Commission in regular session this 10th day of July 2001.

CITY COMMISSION OF THE
CITY OF MADISON, FLORIDA

Attest:

Lee Anne Hall, City Clerk

Herman Cherry, Mayor

Madison County Ordinance 99-108

**ORDINANCE NO. 99-108**

AN ORDINANCE OF THE BOARD OF COUNTY COMMISSIONERS OF MADISON COUNTY, FLORIDA REQUIRING COMMERCIAL AND RESIDENTIAL CONNECTIONS TO MUNICIPAL AND COUNTY WATER SYSTEMS IF WITHIN 200 FEET OF A MUNICIPAL OR COUNTY WATER LINE; PROVIDING FOR SEVERABILITY; AND PROVIDING FOR REPEAL OF CONFLICTING ORDINANCES; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, The Board of County Commissioners has found and determined that public health, safety and welfare is promoted if more residents and commercial establishments are connected to a publicly owned and operated water system so as to minimize the number private wells; and

WHEREAS, it is in the best interest of Madison County and its citizens if the Board of County Commissioners requires all residential, commercial and other buildings connect to a publicly owned and operated water system, where such system service is available; and

WHEREAS, the Board of County Commissioners has found and determined that it would be practical and in the best interest of the County and its citizens, to require any residence, commercial establishment or other structures lying within 200 feet of a publicly owned and operated water system to connect to such system, to the exclusion of private wells or any other alternative means of water supply.

**BE IT ORDAINED BY THE BOARD OF COUNTY COMMISSIONERS OF MADISON COUNTY:**

**SECTION 1:** Part A: All newly constructed residences, newly established commercial businesses, and other structures shall be required to connect to a publicly-owned and

1

operated water system when a water line from such system is located within 200 feet of any newly constructed residence, newly established commercial business or other structure.

Part B: All existing residences, commercial businesses, or other structures, which are servable by a publicly-owned and operated water system (i. e. water line from system is located within 200 feet) but currently utilizing a well or alternate means of water supply will be charged the monthly water availability charge by no more than one utility provider, whether or not connected. The water availability charge shall vary according to municipality or county. If any existing commercial establishment utilizing a well or alternate water supply is located within 200 feet of such water line and said well or alternate water supply for that existing commercial establishment becomes inoperable, then that commercial establishment shall be required to hook onto the public water system.

Part C: The requirements of this Ordinance shall be deemed waived if such residence, commercial establishment or other structure is denied water service by the owner and operator of the publicly owned and operated water supply system, but only for as long as water service is so denied.

**SECTION 2:** The public body who owns and operates the water supply system shall have exclusive authority to set rates and fees, and adopt rules and regulations governing such water supply systems.

**SECTION 3:** SEVERABILITY

Should any provision of this Ordinance be held by a Court of competent jurisdiction to be unconstitutional, invalid or unenforceable, such decision shall not affect the validity of this Ordinance as a whole, or any part thereof, other than the part so declared to be

unconstitutional, invalid or unenforceable.

**SECTION 4:** REPEAL OF CONFLICTING ORDINANCES

All Ordinances or parts of Ordinances in conflict with this Ordinance are to the extent of such conflict hereby repealed.

**SECTION 5:** This ordinance shall take effect as of April 21, 1999.

Passed and Adopted by the Board of County Commissioners, Madison County, Florida, on this 21st day of April, A. D. 1999, at regular session at Madison County, Florida.

BOARD OF COUNTY COMMISSIONERS
OF MADISON COUNTY, FLORIDA

(SEAL) BY: Ronnie L. Moore
Chairman

ATTEST: Tim Sanders
Tim Sanders,
Clerk

C:\Corel\COUNTY\COUNTYWATER.ORD

# APPENDIX C – LAND USE RESTRICTIONS

## 2013 Land Use Restrictions

Inst:201340035882 Date:12/9/2013 Time:3:09 PM
Doc Stamp-Deed:1750.00
DC,Tim Sanders,Madison County Page 1 of 5 B:1112 P:78

THIS INSTRUMENT PREPARED BY:

DAVIS, SCHNITKER, REEVES & BROWNING, P.A.
POST OFFICE DRAWER 652
MADISON, FLORIDA 32340

# WARRANTY DEED

THIS INDENTURE, Made this 9th day of December, 2013, between REGINALD HOWARD WALLACE, a/k/a REGINALD H. WALLACE and JENNIFER RENEE WALLACE, a/k/a JENNIFER R. WALLACE, his wife, whose mailing address is 699 NE Shrine Club Road, Madison, Florida 32340, party of the first part; and MADISON COUNTY, a political subdivision of the State of Florida, whose mailing address is Post Office Box 237, Madison, Florida 32341, party of the second part.

WITNESSETH:

That the said party of the first part, for and in consideration of Ten and No/100 ($10.00) Dollars, and other good and valuable consideration, to it in hand paid by the said party of the second part, the receipt and sufficiency whereof is hereby acknowledged, has granted, bargained and sold to the said party of the second part and its successors and/or assigns forever, the following described land, situate, lying and being in the County of Madison, State of Florida, to-wit:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 1 NORTH; RANGE 9 EAST, MADISON COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT A 5/8" REBAR, LYING AT THE SOUTHWEST CORNER OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 11, SAID POINT ALSO BEING THE POINT OF BEGINNING, FROM SAID POINT OF BEGINNING RUN NORTH 02 DEGREES 19 MINUTES 51 SECONDS WEST, A DISTANCE OF 663.97 FEET TO A 1/2" REBAR No. 2940; THENCE NORTH 89 DEGREES 41

LAW OFFICES OF

Davis, Schnitker, Reeves & Browning, P.A.
P. O. Drawer 652
Madison, Florida
32341

(850) 973-4186

MINUTES 59 SECONDS EAST, A DISTANCE OF 665.92 FEET TO A SET 4X4 CONCRETE MONUMENT No. 2940; THENCE SOUTH 02 DEGREES 19 MINUTES 51 SECONDS EAST, A DISTANCE OF 664.12 FEET TO A SET 1/2" REBAR No. 2940; THENCE NORTH 89 DEGREES 42 MINUTES 47 SECONDS EAST, A DISTANCE OF 666.36 FEET TO A KNOWN 1" IRON PIPE; THENCE SOUTH 02 DEGREES 47 MINUTES 59 SECONDS EAST, A DISTANCE OF 20.11 FEET TO A KNOWN 1/2" REBAR; THENCE SOUTH 89 DEGREES 42 MINUTES 47 SECONDS WEST, A DISTANCE OF 659.86 FEET TO A 5/8" REBAR; THENCE SOUTH 02 DEGREES 47 MINUTES 03 SECONDS EAST, A DISTANCE OF 614.01 FEET TO A 1/2" REBAR; THENCE NORTH 89 DEGREES 57 MINUTES 23 SECONDS WEST, A DISTANCE OF 674.19 FEET TO A 1/2" REBAR; THENCE NORTH 02 DEGREES 38 MINUTES 28 SECONDS WEST, A DISTANCE OF 630.15 FEET TO A 5/8" REBAR, AND THE POINT OF BEGINNING, CONTAINING 20.21 ACRES, MORE OR LESS.

Parcel Identification Number: 11-1N-09-3488-001-001 (Portion of parcel)
Parcel Identification Number: 11-1N-09-3488-002-001 (Entire parcel)

NOTE: TITLE TO THE MOBILE HOME LOCATED ON THE ABOVE DESCRIBED REAL PROPERTY IS NOT BEING CONVEYED.

together with all the tenements, hereditaments and appurtenances, with every privilege, right, title, interest and estate, dower and right of dower, reversion, remainder and easement thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD the same in fee simple forever. And the said party of the first part does covenant with the said party of the second part that they are lawfully seized of said property; that it is free of all incumbrance, and that they have good right and lawful authority to sell the same; and that they will fully warrant the title to said land, and will defend the same against the lawful claims of all persons whomsoever, except for the following:

1. Easement in favor of Madison County Board of Commissioners set forth in instrument recorded in the public records of Madison County, Florida at O.R. Book 425, Page 273.

LAW OFFICES OF

Davis, Schnitker, Reeves & Browning, P.A.
P. O. Drawer 652
Madison, Florida
32341

(850) 973-4186

2. Easement in favor of Florida Power Corporation doing business as Progress Energy Florida, Inc. set forth in instrument recorded in the public records of Madison County, Florida at O.R. Book 900, Page 261.

3. That portion of the above described property which lies to the east of the western boundary line of the maintained right-of-way of NE Shrine Club Road.

OPTION TO REPURCHASE. This conveyance is subject to the party of the first part's option to repurchase, which is hereby reserved by the party of the first part. Upon Madison County's Old Landfill Site (otherwise known as the "Madison County Landfill Superfund Site") located adjacent to the above described real property, ceasing to be a Federally listed "Superfund" site and ceasing to be under any regulatory oversight by either the Federal Environmental Protection Agency or the Florida Department of Environmental Protection, or any successor agency to either, the party of the first part may repurchase the above described property (less and except that portion of the above described property lying to the east of the western boundary line of the maintained right-of-way of NE Shrine Club Road) for the total price of ONE AND NO/100 ($1.00) DOLLAR. The procedure for exercising the option shall be as follows: (1) after the occurrence of the above conditions, the party of the first part shall record in the public records of Madison County a notice (hereinafter the "notice") that the party of the first part is exercising this option to repurchase; (2) on the same date as the recording of the notice, the notice and $1.00 shall be sent, by regular U.S. mail, to the party of the second part c/o the Madison County Clerk of the Circuit Court; (3) Within thirty (30) days after the date the notice is recorded and mailed, the party of the second part shall convey the above described property

LAW OFFICES OF

Davis, Schnitker, Reeves & Browning, P.A.
P. O. Drawer 652
Madison, Florida
32341

(850) 973-4186

(less and except that portion of the above described property lying to the east of the western boundary line of the maintained right-of-way of NE Shrine Club Road) to the party of the first part, by deed of conveyance as provided in Section 125.411, Florida Statutes (2013), as amended. This option must be exercised prior to January 1, 2113. In the event that the notice is not recorded prior to January 1, 2113, then it shall be conclusively presumed that the party of the first part has not timely exercised this option and this option shall terminate and be of no further effect. The death of the party of the first part shall neither shorten nor enlarge the option period. Rather, if the party of the first part dies prior to the termination of the option, the rights remaining under the option shall be an asset of the party of the first part's estate and may pass as any other asset under the laws of intestacy or as devised by will.

Wherever used herein, the term "party" shall include the heirs, personal representatives, successors and/or assigns of the respective parties hereto; the use of the singular number shall include the plural, and the plural the singular; the use of any gender shall include all genders.

(The remainder of this page was intentionally left blank.)

LAW OFFICES OF

Davis, Schnitker, Reeves & Browning, P.A.
P. O. Drawer 652
Madison, Florida
32341

(850) 973-4186

IN WITNESS WHEREOF, the said party of the first part has hereunto set its hand and seal the day and year first above written.

REGINALD H. WALLACE

Witness (please print name under signature) CRAIG B. WILLIS

CLAY A. SCHNITKER

Witness (please print name under signature)

JENNIFER R. WALLACE

STATE OF FLORIDA
COUNTY OF MADISON

Acknowledged before me this 9th day of December, 2013, by REGINALD H. WALLACE and JENNIFER R. WALLACE, who are personally known to me, or who has produced Fla Drivers Lic as identification.

W420728703370 – Reginald Wallace

W420436767840 – Jennifer Wallace

Notary Public

LINDA L DOUD
Notary Public, State of Florida
My Comm. Expires Jan. 17, 2017
Commission No. EE 865961

LAW OFFICES OF

Davis, Schnitker, Reeves & Browning, P.A.
P. O. Drawer 652
Madison, Florida
32341

(850) 973-4186

Inst:201340035863 Date:12/9/2013 Time:3:13 PM
DC,Tim Sanders,Madison County Page 1 of 9 B:1112 P:83

**LEASE OF REAL PROPERTY**

THIS LEASE is made and executed between MADISON COUNTY, a political subdivision of the State of Florida, (hereinafter the "COUNTY"), whose mailing address is Post Office Box 237, Madison, Florida 32341, and REGINALD HOWARD WALLACE, a/k/a REGINALD H. WALLACE and JENNIFER RENEE WALLACE, a/k/a JENNIFER R. WALLACE, husband and wife, (hereinafter collectively the "WALLACES") whose mailing address is 699 NE Shrine Club Road, Madison, Florida 32340.

LEASE OF THE PROPERTY

1. The COUNTY leases to the WALLACES, on the terms set out herein, that certain parcel of real property located entirely in Madison County, Florida more particularly described as follows:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 1 NORTH; RANGE 9 EAST, MADISON COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT A 5/8" REBAR, LYING AT THE SOUTHWEST CORNER OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 11, SAID POINT ALSO BEING THE POINT OF BEGINNING, FROM SAID POINT OF BEGINNING RUN NORTH 02 DEGREES 19 MINUTES 51 SECONDS WEST, A DISTANCE OF 663.97 FEET TO A ½" REBAR No. 2940; THENCE NORTH 89 DEGREES 41 MINUTES 59 SECONDS EAST, A DISTANCE OF 665.92 FEET TO A SET 4X4 CONCRETE MONUMENT No. 2940; THENCE SOUTH 02 DEGREES 19 MINUTES 51 SECONDS EAST, A DISTANCE OF 664.12 FEET TO A SET ½" REBAR No. 2940; THENCE NORTH 89 DEGREES 42 MINUTES 47 SECONDS EAST, A DISTANCE OF 666.36 FEET TO A KNOWN 1" IRON PIPE; THENCE SOUTH 02 DEGREES 47 MINUTES 59 SECONDS EAST, A DISTANCE OF 20.11 FEET TO A KNOWN ½" REBAR; THENCE SOUTH 89 DEGREES 42 MINUTES 47 SECONDS WEST, A DISTANCE OF 659.86 FEET TO A 5/8" REBAR; THENCE SOUTH 02 DEGREES 47 MINUTES 03 SECONDS EAST, A DISTANCE OF 614.01 FEET TO A ½" REBAR; THENCE NORTH 89 DEGREES 57 MINUTES 23 SECONDS WEST, A DISTANCE OF 674.19 FEET TO A ½" REBAR; THENCE NORTH 02 DEGREES 38 MINUTES 28 SECONDS WEST, A DISTANCE OF 630.15 FEET TO A 5/8" REBAR, AND THE POINT OF BEGINNING, CONTAINING 20.21 ACRES, MORE OR LESS.

LESS AND EXCEPT THAT PORTION OF THE ABOVE DESCRIBED PROPERTY LYING TO THE EAST OF THE WESTERN BOUNDARY LINE OF THE MAINTAINED RIGHT-OF-WAY OF NE SHRINE CLUB ROAD.

(hereinafter the "PROPERTY")

LEASE TO ALLOW WALLACES TO REMAIN ON THE PROPERTY

2. The PROPERTY was purchased by the COUNTY from the WALLACES. This lease shall allow the WALLACES to remain on the PROPERTY without interruption. Therefore the effective date of this lease shall be the date the deed for the PROPERTY from the WALLACES to the COUNTY is recorded in the public records of Madison County, Florida.

IMPROVEMENTS ON THE PROPERTY

3. Several improvements are located on the PROPERTY and will be addressed as follows:

3.1 Prior to the above referenced sale of the PROPERTY, the WALLACES maintained their residence in a certain double-wide mobile home (hereinafter the "MOBILE HOME") located on the PROPERTY. The MOBILE HOME was not part of the above referenced sale of the PROPERTY and remains the separate property of the WALLACES. During the term of this lease, the WALLACES may continue to keep the MOBILE HOME on the PROPERTY in its present location and use the MOBILE HOME as a residence. The WALLACES may, from time to time, alter the MOBILE HOME or replace the MOBILE HOME with another mobile home and any such replacement shall be treated the same under this lease as the MOBILE HOME. The WALLACES shall also be free to remove and not replace the MOBILE HOME if they so desire. The WALLACES shall not relocate the mobile home to any location on the PROPERTY other than the location of the MOBILE HOME on the effective date of this lease. The WALLACES shall not repair, replace or alter the MOBILE HOME in any way which results in the repaired, replaced or altered mobile home being more than 5,000 square feet in size. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to safeguard, maintain, repair, remove or replace the MOBILE HOME or any replacement or its contents except for damage to such MOBILE HOME or any replacement or its contents caused by County employees or agents.

3.2 Located on the PROPERTY and adjacent and/or connected to the MOBILE HOME are certain structures including porches, decks, stairs, concrete pads and similar structures. During the term of this lease, the WALLACES may continue to use, repair, alter, replace, remove, or destroy such structures in their sole discretion. The WALLACES shall not repair, alter or replace such structures in any way which results in the structures no longer being connected to the MOBILE HOME or being more than a total of 3,000 square feet in size. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to

safeguard, maintain, repair, remove or replace such structures except for damage to such structures caused by County employees or agents.

3.3 Located on the PROPERTY and near the MOBILE HOME are two sheds which were constructed by the WALLACES and which are not connected to the MOBILE HOME. During the term of this lease, the WALLACES may continue to use, repair, alter, replace, remove, or destroy such sheds in their sole discretion. The WALLACES shall not relocate such sheds to any location on the PROPERTY other than the location of the sheds on the effective date of this lease. The WALLACES shall not repair, alter, replace such sheds in any way which results in the repaired, altered or replaced sheds being more than a total of 2,000 square feet in size. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to safeguard, maintain, repair, remove or replace such sheds except for damage to such sheds caused by County employees or agents.

3.4 Located on and under the PROPERTY and connected to the MOBILE HOME is the WALLACES' existing septic system and water lines from the City of Madison's water distribution system. During the term of this lease, the WALLACES may continue to use, repair, replace, remove, or destroy such septic system and water lines in their sole discretion. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to safeguard, maintain, repair, remove or replace such septic system or water lines except for damage to such system or lines caused by County employees or agents.

3.5 Except as expressly set out above, the WALLACES shall not construct or place on or under the PROPERTY any home, mobile home, porch, deck, stairs, outbuilding, concrete pad or other structure, improvement or system of any kind.

RENTAL

4. The WALLACES shall pay as rent for the PROPERTY the total sum of one ($1.00) dollar, receipt of which is acknowledged.

TERM

5. The term of this lease shall be from the effective date of this lease until January 1, 2113. Provided that the WALLACES may terminate this lease for any reason upon giving 30 days written notice to the COUNTY. The death of the WALLACES shall neither shorten nor enlarge the term of this lease. Rather, if the WALLACES die prior to the last day of the term of this lease, the rights remaining under this lease shall be an asset of the WALLACE's estate and may pass as any other asset under the laws of intestacy or as devised by will.

USE OF THE PROPERTY

6. During the term of this lease, except as may be otherwise expressly prohibited herein, the WALLACES may use the PROPERTY for any lawful residential and/or agricultural purpose and do anything on the PROPERTY, except that, notwithstanding anything else herein to the contrary, the WALLACES shall not do the following on the PROPERTY:

6.1 Dig or install any form of well.

6.2 Dig or disturb the subsurface in any way more than 3 feet below the surface as it existed on the effective date of this lease. (This shall not affect the WALLACES rights with respect to their existing septic system and potable water system regardless of depth.)

6.3 Anything which would interfere with or be inconvenient, in any way, to the COUNTY's remedial activities (as defined below) on the PROPERTY.

7. Notwithstanding anything else herein to the contrary, at all times during the term of the lease, the COUNTY shall have the absolute right to conduct remedial activities on the PROPERTY. Such remedial activities shall include, all activities which the COUNTY determines, in the COUNTY's sole discretion, for the COUNTY's sole benefit and from time to time, are necessary, useful or convenient to the COUNTY's efforts to have the COUNTY's Old Landfill Site (otherwise known as the "Madison County Landfill Superfund Site"), located in the immediate vicinity of the PROPERTY, to no longer be under regulatory oversight by either the Federal Environmental Protection Agency or the Florida Department of Environmental Protection, or any successor agency to either. Such remedial activities shall include, without limitation by enumeration, the following:

7.1 Surveying (including the placement of temporary and permanent markers) on the PROPERTY;

7.2 Entering and remaining on the PROPERTY with manpower and equipment;

7.3 Installing and maintaining wells of all types and number on the PROPERTY;

7.4 Installing and maintaining piping of all types and number (underground or otherwise) to and from such wells from off site;

7.5 Pumping water from and into such wells though such pipes;

7.6 Probing the surface and subsurface of the PROPERTY and taking samples of water and soil;

7.7 Cutting and removing trees and brush on the PROPERTY (without accounting to the WALLACES therefor);

7.8 Digging and moving earth on the PROPERTY (except for the property where the WALLACES maintain their residence and the area immediately surrounding such residence.)

The COUNTY shall not use the PROPERTY to supply fill material for COUNTY roads or any other purpose unrelated to the remedial activities.

ACCESS TO THE PROPERTY

8. The WALLACES shall continue to access the PROPERTY from NE Shrine Club Road using the present drive located on the PROPERTY and the WALLACES may perform whatever maintenance they wish on such drive. The COUNTY may from time to time relocate such drive on the PROPERTY as needed by the COUNTY at the COUNTY's sole expense and provided that the replacement drive shall be of the same or better quality that the drive as it existed on the effective date of this lease. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to safeguard, maintain, repair, remove or replace such drive.

TIMBER

9. The WALLACES may, but shall not be obligated to, harvest, maintain, replant and/or manage the existing timber located on the PROPERTY. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to safeguard, harvest, maintain, remove, replant and/or manage any timber now growing on the PROPERTY or which may grow on the PROPERTY in the future.

UTILITIES

10. The WALLACES presently have all utility services they need (electricity, telephone and potable water service) provided to their home and, during the term of this lease, they shall have the right to continue and maintain such utility service at the WALLACES' sole expense. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to safeguard, maintain, repair, remove or replace such utilities.

TAXES

11. The WALLACES shall be solely responsible for any and all taxes and assessments which are or may become due on this lease, the leasehold interest created in this lease, the MOBILE HOME or any replacement thereof.

INSURANCE

12. The WALLACES are free to insure their property which will be located on the PROPERTY as they see fit. Notwithstanding anything else herein to the contrary, the COUNTY shall have no obligation to provide any form of insurance to or for the benefit of the WALLACES.

ASSIGNMENT OR SUBLEASE OF PROPERTY

13. During the term of this lease the WALLACES may assign or sublet the PROPERTY as they see fit and upon giving notice thereof to the COUNTY, provided that any such assignor or subleasee shall be bound to the terms of this lease to the same extent as the WALLACES themselves.

EFFECT OF WAIVER OF BREACH OF COVENANTS

14. No waiver of any breach or breaches of any provision, covenant, or condition of this lease shall be construed to be a waiver of any preceding or succeeding breach of such provision, covenant, or condition or of any other provision, covenant, or condition.

TIME OF THE ESSENCE

15. Time is of the essence of each and every provision, covenant, and condition herein contained and on the part of the lessee or lessor to be done and performed.

HEADINGS FOR CONVENIENCE ONLY

16. The headings used herein are for convenience and shall not be resorted to for purposes of interpretation or construction hereof.

THIS LEASE SUPERSEDES ALL PREVIOUS AGREEMENTS

17. Except for those matters set out in the deed in which the WALLACES conveyed the PROPERTY to the COUNTY, this lease supersedes and replaces all previous agreements, oral or written, between the COUNTY and the WALLACES concerning the PROPERTY, and represents the whole and entire agreement between the parties. Neither party has entered into this lease in reliance upon any fact or representation not expressly set out in this lease.

AMENDMENT, REVOCATION OR ABANDONMENT OF THIS LEASE

18. This lease may not be amended, revoked, or abandoned except through a written agreement executed by the parties with the same formalities as this lease.

CONDITION OF THE PROPERTY

19. Except as may be expressly set forth in this lease, the PROPERTY and improvements located thereon are being leased "as is, where is", "with all faults", with no warranties as to fitness for any particular purpose. The COUNTY has not made and has not authorized anyone else to make any representations as to the condition of the PROPERTY.

PARTIES BOUND

20. Each and every provision of this lease shall bind and shall inure to the benefit of the parties hereto and their legal representatives. The term "legal representatives" is used in this lease in its broadest possible meaning and includes, in addition to executors and administrators, every person, partnership, corporation, or association succeeding to the interest or to any part of the interest in or to this lease or in or to the leased premises, of either the COUNTY or the WALLACES herein, whether such succession results from the act of a party in interest, occurs by operation of law, or is the effect of the operation of law together with the act of such party. Each and every covenant, agreement, and condition of this lease to be performed by a party shall be binding upon that party's assignees, subtenants, and/or licensees.

HAZARDOUS SUBSTANCES

21. The WALLACES shall not dispose of any hazardous materials on the PROPERTY, nor shall they store or maintain any large quantities of hazardous materials on the PROPERTY.

RADON GAS

22. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health department.

VENUE AND JURISDICTION OF LITIGATION

23. The exclusive venue and jurisdiction for any litigation enforcing, construing or relating to this lease shall be the Circuit Court or the County Court in and for Madison County, Florida. If under applicable law exclusive jurisdiction over any such matters is vested in the federal courts, then exclusive jurisdiction and venue shall be in the United States District Court for the Northern District of Florida, Tallahassee Division.

NO WAIVER OF SOVEREIGN IMMUNITY

24. Notwithstanding anything else herein to the contrary, nothing herein shall be construed to waive or to otherwise affect the COUNTY's sovereign immunity and/or the protections given the COUNTY under Section 768.28, Florida Statutes.

LIABILITY FOR INVITEES

25. The WALLACES shall be solely responsible for the act or omissions of themselves and their invitees while on the PROPERTY and shall be solely responsible for any injuries to themselves, their invitees and their property. The COUNTY does not represent that the PROPERTY is free from hazzards or dangers or is or will be in any particular state of repair.

NO THIRD PARTY BENEFICIARIES

26. The provisions of this lease are for the sole and exclusive benefit of the COUNTY and the WALLACES. No provision of this lease will be deemed for the benefit of any other person or entity, and no other person or entity shall acquire any rights under this lease.

EXECUTED by the COUNTY, this 9th day of December, 2013.

BOARD OF COUNTY COMMISSIONERS
MADISON COUNTY, FLORIDA

By: ______________________
Justin Hamrick
Chair

ATTEST: ______________________
Tim Sanders,
Clerk

(The remainder of this page was intentionally left blank.)

EXECUTED by the WALLACES, this 9th day of December, 2013.

REGINALD H. WALLACE

Witness (please print name under signature)

JENNIFER R. WALLACE

Witness (please print name under signature)

STATE OF FLORIDA
COUNTY OF MADISON

Acknowledged before me this 9th day of December, 2013, by REGINALD H. WALLACE and JENNIFER R. WALLACE, who are personally known to me, or who has produced Fla. Driv. Lic as identification.

Reginald Wallace W420728103370
Jennifer Wallace W420432767840

Notary Public

(The remainder of this page was intentionally left blank.)

LINDA L. DOUD
Notary Public, State of Florida
My Comm. Expires Jan. 17, 2017
Commission No. EE 865961

Inst. Number: 201340033401 Book: 1091 Page: 151 Date: 5/15/2013 Time: 4:32:08 PM Page 1 of 2

Inst:201340033401 Date:5/15/2013 Time:4:32 PM
Doc Stamp-Deed:420.00
DC,Tim Sanders,Madison County Page 1 of 2 B:1091 P:151

Prepared by and return to:

Davis, Schnitker, Reeves & Browning P.A.
519 W. BASE STREET
Madison, FL 32340
850-973-4186
File Number: 5054R

[Space Above This Line For Recording Data]

# Warranty Deed

**This Warranty Deed** made this 13 day of May, 2013 between **RICHARD CLINTON WARREN** whose post office address is **3828 SW 33rd Terrace, Ocala, FL 34474**, grantor, and **MADISON COUNTY, a political subdivision of the State of Florida**, whose Social Security No. is __________ whose post office address is **Post Office Box 237, Madison, FL 32341**, grantee:

(Whenever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth**, that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Madison County, Florida** to-wit:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 1 NORTH; RANGE 9 EAST, MADISON COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT A 4X4 CONCRETE MONUMENT No. 2940, LYING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 11, SAID POINT ALSO BEING THE POINT OF BEGINNING, FROM SAID POINT OF BEGINNING RUN NORTH 89 DEGREES 44 MINUTES 43 SECONDS EAST, A DISTANCE OF 1,331.58 FEET TO A 5/8" REBAR; THENCE SOUTH 02 DEGREES 20 MINUTES 06 SECONDS EAST, A DISTANCE OF 654.33 FEET TO A SET 1/2" REBAR No. 2940; THENCE SOUTH 89 DEGREES 44 MINUTES 43 SECONDS WEST, A DISTANCE OF 1,333.04 FEET TO A SET 1/2" REBAR No. 2940; THENCE NORTH 02 DEGREES 12 MINUTES 26 SECONDS WEST, A DISTANCE OF 654.28 FEET TO A 4X4 CONCRETE MONUMENT No. 2940, AND THE POINT OF BEGINNING, CONTAINING 20.00 ACRES, MORE OR LESS.

SUBJECT TO A PROGRESS ENERGY TRANSMISSION LINE ALONG THE WEST LINE OF THE ABOVE DESCRIBED PROPERTY.

**Parcel Identification Number: 11-1N-09-3487-000-000**

THIS IS NOT THE HOMESTEAD PROPERTY OF THE GRANTOR HEREIN.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold**, the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to **December 31, 2012.**

DoubleTime®

**In Witness Whereof,** grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

Witness Name: William Allan King

Witness Name: Shannon Crayton

(Seal)
RICHARD CLINTON WARREN

State of Florida
County of Marion

The foregoing instrument was acknowledged before me this 13 day of May, 2013 by RICHARD CLINTON WARREN, who [ ] is personally known or [X] has produced a driver's license as identification.

[Notary Seal]

WILLIAM ALLAN KING
MY COMMISSION # DD931024
EXPIRES: November 01, 2013
1-800-3-NOTARY FL Notary Discount Assoc. Co.

Notary Public

Printed Name:

My Commission Expires:

# 2019 Declaration of Restrictive Covenants

Inst: 201940001792 Date: 05/31/2019 Time: 3:55PM
Page 1 of 17 B: 1312 P: 15, WM D. Washington, Clerk of Court
Madison, County, By: AP
Deputy Clerk

This instrument prepared by:
Tom Reeves
Madison County
229 SW Pinckney St.
Madison, Madison County, Florida

## DECLARATION OF RESTRICTIVE COVENANTS

This Declaration of Restrictive Covenants (Declaration) is given this 8th day of MAY, 2019, by the Madison County Board of County Commissioners, a political subdivision of the State of Florida (Grantor), having the address of 229 S.W. Pinckney St., Madison, Madison County, Florida, and concerning a certain portion of the real property located at the Madison County Sanitary Landfill Superfund Site, City of Madison, Madison County, Florida, to the State of Florida Department of Environmental Protection (FDEP or Grantee).

### RECITALS

A. **WHEREAS,** Grantor is the fee simple owner of a parcel of land situated in the county of Madison, State of Florida, more particularly described in Exhibit "A" attached hereto and made a part hereof (the Property);

B. **WHEREAS**, The Property subject to this restrictive covenant is a portion of the property known as the Yard Trash Area portion of the Madison County Sanitary Landfill Superfund Site ("Site"), which the U.S. Environmental Protection Agency ("EPA"), pursuant to Section 105 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9605, listed on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on August 30, 1990, at 55 Fed. Reg. 35502.

C. **WHEREAS,** in a Record of Decision dated September 28, 1992 (ROD), the EPA Region 4 Regional Administrator selected a "remedial action" for the Site.

D. **WHEREAS,** a remedial action selected pursuant to the EPA ROD is being performed on the Site.

E. **WHEREAS,** contaminants in excess of allowable concentrations for unrestricted use may remain at the Property after completion of the remedial action.

F. **WHEREAS,** it is the intent of the restrictions in this declaration to reduce or eliminate the risk of exposure of the contaminants to the environment and to users or occupants of the property and to reduce or eliminate the threat of migration of the contaminants.

G. **WHEREAS,** it is the intention of all parties that EPA is a third-party beneficiary of said restrictions and said restrictions shall be enforceable by the EPA, FDEP, and their successor agencies.

H. **WHEREAS,** the parties hereto have agreed 1) to impose on the Property use restrictions as covenants that will run with the land for the purpose of protecting human health and the environment; and 2) to grant an irrevocable right of access over the Property to the Grantee and its agents or representatives for purposes of implementing, facilitating and monitoring the remedial action; and

I. **WHEREAS,** Grantor deems its desirable and in the best interest of all present and future owners of the Property that the Property be held subject to certain restrictions and changes, that will run with the land, for the purpose of protecting human health and the environment, all of which are more particularly hereinafter set forth.

**NOW THEREFORE,** Grantor, on behalf of itself, its successors, its heirs, and assigns, in consideration of the recitals above, the terms of the Record of Decision, and other good and valuable consideration, the adequacy and receipt of which is hereby acknowledged, does hereby covenant and declare that the Property shall be subject to the restrictions on use set forth below, which shall touch and concern and run with the title of the property, and does give, grant and convey to the Grantee, and its assigns, with general warranties of title, 1) an irrevocable use restriction and site access covenant of the nature and character, and for the purposes hereinafter set forth and 2), the perpetual right to enforce said covenants and use restrictions, with respect to the Property. Grantor further agrees as follows:

a. The foregoing recitals are true and correct and are incorporated herein by reference.

b. Grantor hereby imposes on the Property the following restrictions:

1. **Restrictions on use**: The following covenants, conditions, and restrictions apply to the use of the Property:

a. Contaminated groundwater shall not be used until State groundwater standards and the groundwater cleanup standards identified in the ROD are met.

b. There shall be no drilling for water conducted on the Property nor shall any wells, including monitoring wells, be installed on the Property unless pre-approved by FDEP and EPA.

c. There shall be no construction activities or any uses of the Property that would impact the integrity of the cap depicted in Exhibit C, described below. Should future development require disturbance of the cap, additional response actions may be necessary.

d. Attached as Exhibit C, and incorporated by reference herein, is a survey map delineating the Property bounds and features, showing the limits of the landfill cap, and identifying the size and location of existing stormwater swales, stormwater detention or retention facilities, and ditches on the Property. Such existing stormwater features shall not be altered, modified, or expanded without prior approval from the FDEP and EPA. There shall be no additional stormwater swales, stormwater detention or retention facilities, or ditches constructed on the Property or any excavation on the Property whatsoever unless previously approved by FDEP and EPA.

e. For any dewatering activities, a plan must be submitted and approved by FDEP and EPA to address and ensure the appropriate handling, treatment, and disposal of any extracted groundwater that may be contaminated.

f. The Property shall only be used for industrial purposes. There shall be no agricultural use of the land including forestry, fishing and mining; no hotels or lodging; no recreational uses including amusement parks, parks, camps, museums, zoos, or gardens; no residential uses, and no educational uses such as elementary and secondary schools, or day care services.

g. On-site engineering controls, as identified in Exhibit C, shall be maintained. This restriction may only be modified pursuant to Paragraph 3 of this Declaration. For any construction activities, a plan must be submitted and approved by FDEP and EPA to address and ensure the appropriate management of any contaminated soil that may be encountered.

h. The restrictions imposed above may be only be modified pursuant to Paragraph 3 of this Declaration.

2. **Irrevocable Covenant for Site Access**: Access to the Property from the nearest public right of way is granted via the Access and Easement Agreement attached hereto as Exhibit D, and recorded with this Restrictive Covenant. Grantor further hereby grants to Grantee, its agents and representatives, an irrevocable, permanent, and continuing right of access at all reasonable times to the Property for purposes of:

a. Implementing the response actions in the ROD;

b. Verifying any data or information submitted to EPA and Grantee;

c. Verifying that no action is being taken on the Property in violation of the terms of this instrument or of any federal or state environmental laws or regulations;

d. Monitoring response actions on the Site and conducting investigations relating to contamination on or near the Site, including, without limitation, sampling of air, water, sediments, soils, and specifically, without limitation, obtaining split or duplicate samples;

e. Conducting periodic reviews of the remedial action, including but not limited to, reviews required by applicable statutes and/or regulation.

3. **Modification:** This Declaration shall not be modified, amended, or terminated without the written consent of FDEP or its successor agency. FDEP shall not consent to any such modification, amendment or termination without the written consent of EPA.

4. **(a)** **Reserved Rights of Grantor**: Grantor hereby reserves unto itself, its successors, its heirs, and assigns, all rights and privileges in and to the use of the Property which are not incompatible with the restrictions, rights, and covenants granted herein.

**(b)** **Reserved Rights of EPA**: Nothing in this document shall limit or otherwise affect EPA's rights of entry and access or EPA's or authority to take response actions under CERCLA,

the NCP, or other federal law.

(c) **Reserved Rights of Grantee**: Nothing in this document shall limit or otherwise affect Grantee's rights of entry and access or authority to act under state or federal law.

5. **Notice requirement**: Grantor agrees to include in any instrument conveying any interest in any portion of the Property, including but not limited to deeds, leases, and mortgages, a notice which is in substantially the following form:

> **NOTICE: THE INTEREST CONVEYED HEREBY IS SUBJECT TO A DECLARATION OF RESTRICTIVE AND AFFIRMATIVE COVENANTS DATED _______________, 2019, RECORDED IN THE PUBLIC LAND RECORDS ON_, 2019, IN BOOK_______, PAGE _____, IN FAVOR OF, AND ENFORCEABLE BY, THE STATE OF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION.**

Within thirty (30) days of the date any such instrument of conveyance is executed, Grantor must provide Grantee and EPA with a certified true copy of said instrument and, if it has been recorded in the public land records, its recording reference.

6. **Administrative Jurisdiction**: FDEP or any successor state agency having administrative jurisdiction over the interests acquired by the State of Florida by this instrument is the Grantee. EPA is a third-party beneficiary to the interests acquired by FDEP.

7. **Enforcement**: The Grantee shall be entitled to enforce the terms of this instrument by resort to specific performance or legal process. These restrictions may also be enforced in a court of competent jurisdiction by any other person, firm, corporation or governmental agency that is substantially benefitted from this declaration. All remedies available hereunder shall be in addition to any and all other remedies at law or in equity, including CERCLA. Enforcement of the terms of this instrument shall be at the discretion of the Grantee, and any forbearance, delay, or omission to exercise its rights under this instrument in the event of a breach of any term of this instrument shall not be deemed to be a waiver by the Grantee of such term or of any subsequent breach of the same or any other term, or of any of the rights of the Grantee under this instrument. It is expressly agreed that EPA is not the recipient of a real property interest but is a third- party beneficiary of the Declaration of Restrictive Covenants, and as such, has the right of enforcement.

8. **Damages**: Grantee shall be entitled to recover damages for violations of the terms of this instrument, or for any injury to the remedial action, to the public, or to the environment protected by this instrument.

9. **Waiver of certain defenses**: Grantor hereby waives any defense of laches, estoppel, or prescription.

10. **Covenants**: Grantor hereby covenants to and with the Grantee, that the Grantor is lawfully seized in fee simple of the Property, that the Grantor has a good and lawful right and power to sell and convey it or any interest therein, that the Property is free and clear of encumbrances, except those noted on Exhibit B attached hereto, and that the Grantor will forever warrant and defend the title thereto and the quiet possession thereof.

11. **Notices:** Any notice, demand, request, consent, approval or communication that either party desires or is required to give to the other shall be in writing and shall either be served personally or sent by first class mail, postage prepaid, referencing the Site name and Site ID number and addressed as follows:

**To Grantor:**

Madison County Board of County Commissioners
229 S.W. Pinckney St.
Madison, FL 32341

**To Grantee:**

Florida Department of Environmental Protection
Attn: Waste Cleanup Program Administrator
2600 Blair Stone Road, MS 4505
Tallahassee, FL 32399-2400

**To (as Third-Party Beneficiary):**

U.S. EPA, Region 4 Superfund Division
Attn: Division Director
61 Forsyth Street, SW Atlanta, GA 30303

12. **Recording in Land Records:** Grantor shall record this Declaration of Restrictive and Affirmative Covenants in timely fashion in the Official Records of Madison County, Florida, and shall rerecord it at any time Grantee may require, to preserve its rights. Grantor shall pay all recording costs and taxes necessary to record this document in the public records.

13. **General provisions:**

a. Controlling law: The interpretation and performance of this instrument shall be governed by the laws of the United States or, if there are no applicable federal laws, by the law of the state where the Property is located.

b. Liberal construction: Any general rule of construction to the contrary notwithstanding, this instrument shall be liberally construed in favor of the grant to affect the purpose of this instrument and the policy and purpose of CERCLA. If any provision of this instrument is found to be ambiguous, an interpretation consistent with the purpose of this instrument that would render the provision valid shall be favored over any interpretation that would render it invalid.

c. Severability: If any provision of this instrument, or the application of it to any person or circumstance, is found to be invalid, the remainder of the provisions of this instrument, or the application of such provisions to persons or circumstances other than those to which it is found to be invalid, as the case may be, shall not be affected thereby.

d. Entire Agreement: This instrument sets forth the entire agreement of the parties with respect to rights and restrictions created hereby, and supersedes all prior discussions, negotiations, understandings, or agreements relating thereto, all of which are merged herein.

e. No Forfeiture: Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

f. Joint Obligation: If there are two or more parties identified as Grantor herein, the obligations imposed by this instrument upon them shall be joint and several.

g. Successors: The term "Grantor", wherever used herein, and any pronouns used in place thereof, shall include the persons and/or entities named at the beginning of this document, identified as "Grantor" and their personal representatives, heirs, successors, and assigns. The term "Grantee", wherever used herein, and any pronouns used in place thereof, shall include the persons and/or entities named at the beginning of this document, identified as "Grantee" and their personal representatives, heirs, successors, and assigns including any successor state agency to FDEP having administrative jurisdiction over the interests acquired by the State of Florida under this instrument. The rights of the Grantee and Grantor under this instrument are freely assignable, subject to the notice provisions hereof.

h. Captions: The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

i. Counterparts: The parties may execute this instrument in two or more counterparts, which shall, in the aggregate, be signed by both parties; each counterpart shall be deemed an original instrument as against any party who has signed it. In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

**TO HAVE AND TO HOLD** unto the State of Florida Department of Environmental Protection and its successors and assigns forever.

**(Rest of page left intentionally blank, signature pages to follow)**

IN WITNESS WHEREOF, Madison County has executed this instrument, this 13th day of May, 2019.

GRANTOR:
Board of County Commissioners
Madison County, Florida

By: [signature]

H. Alston Kelley, Chair
229 S.W. Pinckney St.
Madison, FL 32341

Signed, sealed and delivered in the presence of:

[signature] Date: 5/13/19
Witness
Print Name: William D. Washington

[signature] Date: 5/13/19
Witness
Print Name: Valerie L. Miller

STATE OF Florida )

COUNTY OF Madison )

The foregoing instrument was acknowledged before me this 13th day of May, 2019, by H. Alston Kelley.

Personally Known ✓ OR Produced Identification ________.
Type of Identification Produced ________.

[signature]
Signature of Notary Public
Commission No.
Commission Expires:

JUDY TOWNSEND
Notary Public – State of Florida
Commission # GG 103162
My Comm. Expires May 24, 2021
Bonded through National Notary Assn.

Approved as to form by the Florida Department of Environmental Protection, Office of General Counsel ________________________.

IN WITNESS WHEREOF, the Florida Department of Environmental Protection has executed this instrument, this 28 day of MAY, 2019.

FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
By: ________________________
Name: Tim J. Bahr
Title: Director, Division of Waste Management
2600 Blair Stone Road, MS 4500
Tallahassee, FL 32399-2400

Signed, sealed and delivered in the presence of:

Witness: ________________________ Date: 5/28/19
Print Name: Teresa Booeshaghi

Witness: ________________________ Date: 5/28/19
Print Name: Griffin Kalchakian

STATE OF FLORIDA)
COUNTY OF LEON)

The foregoing instrument was acknowledged before me this 28 day of MAY 2019, by TIM J. BAHR as representative for the Florida Department of Environmental Protection.
Personally Known ✓ OR Produced Identification N/A.
Type of Identification Produced N/A.

________________________
Signature of Notary Public

JUDITH PENNINGTON
Commission # GG 292065
Expires March 31, 2023
Bonded Thru Budget Notary Services

JUDITH PENNINGTON
Print Name of Notary Public
Commission No. GG 292065
Commission Expires: MARCH 31 2023

| | | | |
|---|---|---|---|
| Attachments: | **Exhibit A** | - | Legal Description of the Property |
| | **Exhibit B** | - | Existing Liens and Encumbrances on the Property |
| | **Exhibit C** | - | Survey of Cap and Stormwater Features on the Property |
| | **Exhibit D** | - | Access Easement Agreement |

# EXHIBIT A

Legal description of fenced land fill area for Madison County, FL

All that tract or parcel of land situate, lying and being located in Section 11, Township 1 North, Range 9 East, Madison County, Florida containing 8.770 acres and being more particularly described as follows: For a POINT OF BEGINNING begin at a fence corner with the coordinates of N 548635.4216, E 2317940.1061 (coordinate system of NAD 1983, Florida North Zone) thence south 88 degrees 15 minutes 38 seconds east along a fence line for a distance of 510.30 feet to a fence corner with coordinates of N 548619.9313, E 2318450.1756; thence south 02 degrees 20 minutes 59 seconds east along a fence line for 789.35 feet to a fence corner with coordinates of N 547831.2441, E 2318482.5378; thence south 89 degrees 40 minutes 07 seconds west along a fence line for a distance of 478.04 feet to a fence corner with coordinates of N 547828.4782, E 2318004.505; thence north 14 degrees 39 minutes 48 seconds west along a fence line for a distance of 28.72 feet to a fence corner with coordinates of N 547856.261, E 2318011.7747; thence north 03 degrees 28 minutes 48 seconds east along a fence line for a distance of 725.34 feet to a fence corner with coordinates of N 548580.2665, E 2317967.7468; thence north 74 degrees 12 minutes 43 seconds west along a fence line for a distance of 32.83 feet to a fence corner with coordinates of N 548589.1985, E 2317936.1565; thence north 04 degrees 53 minutes 02 seconds east along a fence line for a distance of 46.39 feet to a fence corner being the POINT OF BEGINNING. Said property being bounded on the west, north and south by other lands of Madison County and on the east by lands of Madison County and Reginald Wallace.

Barbara L Herring

Barbara L. Herring Land Surveyor No. 6194
Information taken from surveys with dates of
January 4, 2012 thru September 2, 2016.
GPS using commercial real time network
created by EGPS Solutions, Inc and Florida
Permanent Reference Network

BARBARA L. HERRING
License Number
6194
STATE OF
FLORIDA
Professional Surveyor and Mapper

# Exhibit B

## Easements and Recorded Leases

**Tax Parcel No. 11-1N-09-348-001-01A**

The subject parcel is unencumbered and is subject to the following matters which affect title:

1. Easement dated January 3, 1997 from Henry B. Smith, Jr. and Jean B. Smith to Madison County, recorded January 23, 1997 in Official Records Book 425, Page 273, granting Madison County a five-foot (5') access easement for purposes of accessing certain gas monitoring wells owned by Madison County.

2. Lease of Real Property dated December 9, 2013 between Madison County and Reginald Howard Wallace, a/k/a Reginald H. Wallace, and Jennifer Renee Wallace, a/k/a Jennifer R. Wallace, husband and wife (the "Wallaces"), recorded December 9, 2013 in Official Records Book 1112, Page 83. The subject lease permits the Wallaces to remain and reside upon the subject parcel following its conveyance to Madison County.

**Tax Parcel No. 11-IN-09-3488-002-001**

The subject parcel is unencumbered and is subject to the following matters which affect title:

1. Distribution Easement dated August 23, 1996 from Frederick J. Bochnia and Vivian B. Bochnia to Florida Power Corporation, recorded November 21, 1996 in Official Records Book 420, Page 240. Subject easement establishes a 20' utility easement lying 1O' on each side of Florida Power's facilities.

2. Distribution Easement dated February 23, 2008 from Frederick Joseph Bochnia, Lillian Vivian Bass, and Benjamin Keith Bochnia to Progress Energy Florida, recorded March 28, 2008 in Official Records Book 900, Page 261. Subject easement establishes a 20' utility easement lying 10' on each side of Progress Energy Florida's facilities.

3. Lease of Real Property dated December 9, 2013 between Madison County and Reginald Howard Wallace, a/k/a Reginald H. Wallace, and Jennifer Renee Wallace, a/k/a Jennifer R. Wallace, husband and wife (the "Wallaces"), recorded December 9, 2013 in Official Records Book 1112, Page 83. The subject lease permits the Wallaces to remain and reside upon the subject parcel following its conveyance to Madison County.

**Tax Parcel No. 11-IN-09-3486-001-000**

The subject parcel is unencumbered and is subject to the following matters which affect title:

# Exhibit B

1. Easement dated April 6, 1951 from J.F. Cottingham and Cora Cottingham to Florida Power Corporation, recorded May 18, 1951 in Deed Book 75, Page 182. Subject easement establishes a blanket utility easement over the subject parcel.

2. Easement dated December 7, 1983 from Madison County to Biomass Power Corporation, recorded December 9, 1983 in Official Records Book 146, Page 202. Subject easement establishes 100' wide utility easement over approximately 0.5 acres of the subject parcel. As assigned by Assignment of Easement Rights dated April 16, 1984 from Biomass Power Corporation to Florida Power Corporation, recorded May 14, 1984 in Official Records Book 149, Page 751, and as assigned by Partial Assignment of Easement Rights dated March 18, 1998 from Florida Power Corporation to LFC No. 47 Corp., recorded March 25, 1998 in Official Records Book 466, Page 129.

3. Declaration to the Public Regarding Closure of Solid Waste Landfill (Madison County Central Landfill) dated May 30, 1996 by Madison County, recorded January 14, 1997 in Official Records Book 424, Page 349.

**Tax Parcel No. 11-1N-09-3487 -003-000**

The subject parcel is unencumbered and is subject to the following matters which affect title:

1. Easement dated April 6, 1951 from Louise B. Guynn as Executrix of the Estate of Charles A. Bunting, Sr., Deceased, to Florida Power Corporation, recorded May 2, 1964 in Official Records Book 29, Page 632. Subject easement establishes a blanket utility easement over the West ½ of the subject parcel.

2. Guying Easement dated October 10, 1983 from C. Clinton Warren and Phyllis S. Warren to Florida Power Corporation, recorded December 2, 1983 in Official Records Book 146, Page 66.

# EXHIBIT C


EXHIBIT C
MAP FEATURES
FORMER MADISON COUNTY LANDFILL
MADISON,FLORIDA
APRIL 2018
100'
0
100'
MSE GROUP
Page 12 of 17

# EXHIBIT D

## ACCESS EASEMENT AGREEMENT

THIS ACCESS EASEMENT AGREEMENT, is made and entered into by and between the Madison County Board of County Commissioners, whose mailing address is 229 S.W. Pinckney St., Madison, Madison County, Florida (hereinafter referred to as "GRANTOR") a political subdivision of the State of Florida, and its successors and assigns, and the FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION and its successors and assigns (hereinafter referred to as "FDEP").

**WITNESSETH:**

WHEREAS, GRANTOR is the fee simple owner of certain real property (hereinafter "Easement Parcel") located in Madison County, Florida, as more particularly described in Exhibit "A", attached hereto and by reference made a part hereof; and

WHEREAS, on even date herewith, FDEP and GRANTOR have entered into that certain Declaration of Restrictive Covenant (the "Restrictive Covenant"), encumbering certain property ("the property"); and

WHEREAS, FDEP desires to use the Easement Parcel in order to gain access to the property for the purpose of inspecting, viewing and monitoring the property and GRANTOR's compliance with the obligations set forth in the Restrictive Covenant related to the property; and

WHEREAS, FDEP's actions on the property are taken in an attempt to ensure compliance with the requirements contained in the Restrictive Covenant encumbering the property; and

WHEREAS, GRANTOR desires to grant to FDEP an easement for the aforementioned purpose.

NOW, THEREFORE, for and in consideration of the terms, conditions, and mutual covenants contained herein and other good and valuable consideration received by each party, the sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. GRANTOR hereby grants to FDEP, its legal successors and assigns, a non-exclusive easement for ingress and egress in and upon the Easement Parcel for the purposes described above (hereinafter, the "Easement").

2. The terms of the Easement shall commence upon the date of full execution of this Easement and shall continue in perpetuity; provided, however, this Easement shall terminate and be of no further force and effect upon the termination of the Restrictive Covenant by the FDEP.

3. GRANTOR agrees that FDEP and its employees, contractors, and agents shall have ingress and egress to and from the property over and across the Easement Parcel to affect the purposes of this Easement.

4. In order to ensure the perpetual nature of this Easement, the GRANTOR and its successors and assigns shall reference this Easement in any subsequent deed of conveyance, including the recording information for this Easement.

5. GRANTOR hereby represents and warrants that GRANTOR has fee title in the Easement Parcel; and GRANTOR represents and warrants that it has the power and authority to grant this Easement. With respect to its use of the Easement Parcel, FDEP shall be responsible for injury or damage to persons or property for which it is found legally liable.

6. GRANTOR reserves the right to use or authorize others to use the Easement Parcel in any manner not inconsistent with or which will not unreasonably interfere with the rights granted herein, provided, however, that GRANTOR shall not disturb or block access in any way without prior approval from FDEP.

7. In the event FDEP determines that the Easement Parcel is no longer needed for the purposes set forth herein, FDEP may terminate this Easement by notifying GRANTOR, in writing, at least sixty (60) days prior to the date of such termination. In such event, FDEP agrees to execute an instrument in recordable form, releasing this Easement.

8. This Easement shall be binding upon and inure to the benefit of the parties specified herein, their legal representatives, successors and assigns.

9. This Easement does not impact or modify any other legal authority FDEP may have to inspect the Easement Parcel or property for regulatory purposes pursuant to Chapters 376 and 403, Florida Statutes.

10. GRANTOR shall maintain the Easement Parcel so that a standard sized two-wheeled drive motor vehicle can traverse the Easement Parcel.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and have caused this Easement to be executed as of the day and year last written below.

<u>REMAINDER OF PAGE INTENTIONALLY LEFT BLANK</u>

IN WITNESS WHEREOF, the County of Madison has executed this instrument, this 13th day of May, 2019.

GRANTOR:

Board of County Commissioners
Madison County, Florida

By: [signature]
H. Alston Kelley, Chair
229 S.W. Pinckney St.
Madison, Madison County, Florida

Signed, sealed and delivered in the presence of:

[signature] Date: 5/13/19
Witness
Print Name: WILLIAM D. WASHINGTON

[signature] Date: 5/13/19
Witness
Print Name: Valerie L. Miller

STATE OF FLORIDA )

COUNTY OF MADISON )

The foregoing instrument was acknowledged before me this 13th day of May, 2019.

Personally Known ✓ OR Produced Identification ___.
Type of Identification Produced ____________.

[signature]
Signature of Notary Public

JUDY TOWNSEND
Notary Public - State of Florida
Commission # GG 103162
My Comm. Expires May 24, 2021
Bonded through National Notary Assn.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Approved as to form by the Florida Department of Environmental Protection, Office of General Counsel ____________________.

IN WITNESS WHEREOF, the Florida Department of Environmental Protection has executed this instrument this 28 day of MAY, 2019.

FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION

____________________
Tim J. Bahr, Director
Division of Waste Management
Department of Environmental Protection
2600 Blair Stone Road, MS 4500
Tallahassee, Florida 32399-2400

Signed, sealed and delivered in the presence of:

____________________ Date: 5/28/19
Witness
Print Name: Teresa Booeshaghi

____________________ Date: 5/28/19
Witness
Print Name: Griffin Kolchakian

STATE OF FLORIDA )

COUNTY OF LEON )

The foregoing instrument was acknowledged before me this 28 day of MAY, 2019.

Personally Known ✓ OR Produced Identification N/A.
Type of Identification Produced N/A.

____________________
Signature of Notary Public

NOTARY PUBLIC STATE OF FLORIDA
JUDITH PENNINGTON
Commission # GG 292065
Expires March 31, 2023
Bonded Thru Budget Notary Services

Attachment: Exhibit A – Access Easement Survey

**Exhibit A**




Page 17 of 17

# APPENDIX D: FDEP COMMENTS ON ROD AMENDMENT

**FLORIDA DEPARTMENT OF**
**Environmental Protection**

Bob Martinez Center
2600 Blair Stone Road
Tallahassee, Florida 32399-2400

**Ron DeSantis**
Governor

**Jeanette Nuñez**
Lt. Governor

**Shawn Hamilton**
Secretary

## Memorandum

**TO:** Dean Cox, Environmental Consultant
Waste Site Cleanup, Waste Cleanup Program, DWM

**THROUGH:** Brian Dougherty, Program Manager
District & Business Support Program, DWM

Digitally signed by Brian Dougherty
Date: 2022.04.15 15:26:04 -04'00'

**FROM:** Michael J. Bland, Professional Geologist II
District & Business Support Program, DWM

Digitally signed by Michael Bland
Date: 2022.04.15 13:36:42 -04'00'

**SUBJECT:** Former Madison County Sanitary Landfill
County Road C-591, Madison, Madison County
Feasibility Study, dated December 2021
Amended Record of Decision for Groundwater Summary of Remedial Alternative Selection, dated February 2022
FDEP Site ID#: ERIC_11009

**DATE:** April 15, 2022

---

I have completed the review of the Feasibility Study, dated December 2021, prepared and submitted by MSE Group (MSE), the Amended Record of Decision for Groundwater Summary of Remedial Alternative Selection, dated February 2022, prepared and submitted by U. S. Environmental Protection Agency Region 4, and the Department's site file, for the above referenced site. The following comments are provided to assist Waste Site Cleanup staff with their review of this submittal and should not be inferred to be an approval of the subject document.

Based on my review of the Feasibility Study, the Amended Record of Decision for Groundwater Summary of Remedial Alternative Selection, and the Department's file, I have the following comments:

1. I agree with MSE that, of the groundwater remedial alternatives, Alternative III, phased enhanced reductive dichlorination (ERD) with supplemental amendments followed by performance monitoring and optional in-situ chemical oxidation (ISCO) hotspot treatment for 1,4-dioxane, appears to be the best.

2. Figures showing chemicals of concern extent contour lines should include a contour line that shows the estimated extent of contamination to the Department's Groundwater Cleanup Target Levels (GCTLs) and not just to the Natural Attenuation Default Concentrations (NADCs) and 10x NADCs. The sizes of the groundwater contaminant plumes should be measured by using the estimated extent of contamination to the GCTLs and not to the NADCs.

3. I agree with amending the Record of Decision by updating the current groundwater standards and including 1,4-dioxane as a chemical of concern.

If you have any questions, please contact me at (850) 245-8912 or at mike.bland@floridadep.gov.

# APPENDIX E- FIGURE E.1

Estimated CVOC Cleanup Time - Linear Scale Feasibility Study
Madison County Sanitary Landfill Site
Madison, Florida



# APPENDIX E- FIGURE E.2

Estimated CVOC Cleanup Time - Logarithmic Scale Feasibility Study
Madison County Sanitary Landfill Site
Madison, Florida



# APPENDIX F: ARARs and TBCs

| CHEMICAL-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Classification of ground water | All ground water of the state is classified according to the designated uses and includes the following:<br>Class G-I – Potable water use, ground water in single source aquifer which has total dissolved solids content of less than 3,000 mg/l.<br>Class G-II – Potable water use, ground water in aquifers which has total dissolved solids content of less than 10,000 mg/l, unless otherwise classified by the Florida Environmental Regulation Commission. | Groundwater within the state of Florida – **Applicable** | F.A.C. 62-520.410 |
| Restoration of ground water as a potential drinking water source | All ground water (except for Class G-IV) shall meet the minimum criteria for ground water specified in F.A.C. 62-520.400(1)(a)-(f). | Ground water within the state of Florida with designated beneficial use(s) of Class G-I or Class G-II – **Relevant and Appropriate** | F.A.C. 62-520.400 Minimum Criteria for Ground Water |
| | Class I and Class II ground water shall meet the primary drinking water standards listed in FAC 62-550.310 for public water systems, except as otherwise specified. | | F.A.C. 62-520.420(1) Standards for Class I and Class II Ground Water |
| | Shall not exceed the maximum contaminant level (MCL) listed in, Table 4 VOLATILE ORGANIC CONTAMINANTS.<br>(These standards may also apply as ground water quality standards as referenced in Chapter 62-520, F.A.C.)<br>• Trichloroethylene (TCE) – 0.003 mg/L<br>• cis-1,2 - DCE – 0.07 mg/L<br>• vinyl chloride – 0.001 mg/L | Supply of water to public water system, as defined in F.A.C. 62-550.200 (17) – **Relevant and Appropriate** | F.A.C. 62-550.310 Primary Drinking Water Standards |

| CHEMICAL-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Restoration of groundwater as a potential drinking water source | Specifies Groundwater Cleanup Target Levels (CTLs) for site rehabilitation. F.A.C. 62-777.170 Table I lists the default Groundwater Criteria.<br>• Trichloroethylene (TCE) – 3 ug/L<br>• cis-1,2 - DCE – 70 ug/L<br>• vinyl chloride – 1 ug/L<br>• 1,4 - dioxane – 3.2 ug/L | Rehabilitation (i.e., remediation) of site contaminated groundwater – **Relevant and Appropriate** | F.A.C. 62-780.150(5)<br>F.A.C. 62-777.170(1)(a) |

**Notes:**

ARAR - applicable *or* relevant and appropriate requirement CFR - Code of Federal Regulations

F.A.C. - Florida Administrative Code, Chapters as specified

F.S. - Florida Statutes

TBC - To Be Considered guidance ug/L - micrograms per liter

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| ***Groundwater Monitoring and Injection Wells – Installation, Operation, and Abandonment*** | | | |
| Groundwater Monitoring Well Installation | Provides detailed guidance to assist in monitoring well design and material specifications for construction of groundwater monitoring well. | Installation of groundwater monitoring well to detect migration of contaminants – **To Be Considered** | FDEP, Monitoring Well Design and Construction Guidance Manual (2008) |
| | Before construction of new ground water monitoring wells, a soil boring shall be made at each new monitoring well location to properly determine monitoring well specifications such as well depth, screen interval, screen slot, and filter pack. | Installation of groundwater monitoring well to detect migration of contaminants – **Relevant and Appropriate** | F.A.C. 62-520.600(6)(g) |
| Construction and repair of groundwater well | Construction of water well shall be in accordance with the substantive requirements specified in F.A.C. 62-532.500(1)(a) through (i) as appropriate. | Installation of water well as defined in F.A.C. 62-532.200 – **Relevant and Appropriate** | F.A.C. 62-532.500(1)<br>Well Casing, Liner Pipe, Coupling and Well Screen Requirements |
| | Wells shall be constructed to meet the following construction criteria specified in F.A.C. 62-532.500(3)(a), (b), (e), (f), (g), (h) and (i) as appropriate. | | F.A.C. 62-532.500(3)<br>Well Construction Criteria |
| Well Covers and Upper Terminus | Wells shall be covered with a tamper resistant cover when there is an interruption in work and meet the criteria specified in F.A.C. 62-532.500(4)(a) and (b) as appropriate. | | F.A.C. 62-532.500(4)<br>Top of the Well |
| Plugging and abandonment of groundwater wells | All abandoned wells shall be plugged by filling them from bottom to top with neat cement grout or bentonite and capped with a minimum of one foot of neat cement grout. An alternate method providing equivalent protection shall be approved by the Department and EPA. | Abandonment of water well as defined in F.A.C. 62-532.200 – **Relevant and Appropriate** | F.A.C. 62-532.500(5) |
| | In the abandonment of a water well, caution shall be taken to minimize the potential entrance of contaminants into the bore hole and ground water resource. | | F.A.C. 62-532.500(3)(f) |
| | Only water from a potable water source shall be used in the abandonment of a water well. | | F.A.C. 62-532.500(3)(g) |
| Injection of remediation amendments into groundwater | An injection activity cannot allow the movement of fluid containing any contaminant into USDWs, if the presence of that contaminant may cause a violation of the primary drinking water standards under 40 CFR part 141, other health- | Class V wells [as defined in 40 CFR § 144.6(e)] – **Relevant and Appropriate** | 40 CFR § 144.82(a)(1) |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| | based standards, or may otherwise adversely affect the health of persons.<br>This prohibition applies to well construction, operation, maintenance, conversion, plugging, closure, or any other injection activity. | | |
| | Wells must be closed in a manner that complies with the above prohibition of fluid movement. Also, any soil, gravel, sludge, liquids, or other materials removed from or adjacent to the well must be disposed or otherwise managed in accordance with substantive applicable Federal, State, and local regulations and requirements. | | 40 CFR § 144.82(b) |
| General Criteria for Class V well used for underground injection<br>(e.g., infiltration gallery) | A well shall be designed and constructed for its intended use, in accordance with good engineering practices. | Operation of Class V well Group 4 (wells associated with aquifer remediation projects) – **Relevant and Appropriate** | F.A.C. 62-528.605(1) |
| | May not cause or allow fluids to migrate into underground source of drinking water which may cause a violation of a primary or secondary drinking water standard contained in Chapter 62-550, F.A.C., or minimum criteria contained in Rule 62-520.400, F.A.C., or may cause fluids of significantly differing water quality to migrate between underground sources of drinking water. | | F.A.C. 62-528.605(2) |
| Construction of Class V well used for underground injection | Shall be constructed so that their intended use does not violate the water quality standards of Chapter 62-520. F.A.C., at the point of discharge, except where specifically allowed in subsection65-522.300(2), F.A.C. | Operation of Class V well Group 4 (wells associated with aquifer remediation projects) – **Relevant and Appropriate** | F.A.C. 62-528.605(3) |
| | All drilled wells shall, at a minimum, meet the casing and cementing requirements for water well construction set forth in Chapter 62-532, F.A.C. | | F.A.C. 62-528.605(7) |
| Operation of Class V well used for underground injection | Shall be used or operated in a manner that it does not present a hazard to an underground source of water. | Operation of Class V well Group 4 (wells associated with aquifer remediation projects) – **Relevant and Appropriate** | F.A.C. 62-528.610(1) |
| | Pretreatment for fluids injected through existing wells shall be performed if necessary to ensure the injected fluid does not violate applicable water quality standards in Chapter 52-520, F.A.C. | | F.A.C. 62-528.610(3) |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Plugging and abandonment of Class V well used for underground injection | Prior to abandoning Class V wells, the well shall be plugged with cement in a manner that will not allow movement of fluids between underground sources of water. Placement of the cement shall be accomplished by any recognized and approved method. | Operation of Class V well Group 4 (wells associated with aquifer remediation projects) – **Relevant and Appropriate** | F.A.C. 62-528.625(3) |
| Monitoring of Class V well used for underground injection | The need for monitoring shall be determined by the type of well, nature of injected fluid, and the water quality of the receiving and overlying aquifers.<br>*NOTE*: The monitoring parameters and frequency will be specified in a CERCLA document such as Remedial or Removal Action Work Plan. | Operation of Class V well Group 4 (wells associated with aquifer remediation projects) – **Relevant and Appropriate** | F.A.C. 62-528.615(1) and (2) |
| Post-Active Remediation Monitoring for groundwater treatment system | Unless otherwise provided in CERCLA Remedial/Removal Action Work Plan, the following shall be performed as follows:<br>• A minimum of two monitoring wells is required with at least one located at the downgradient edge of the plume; and at least one located in the area(s) of highest groundwater contamination or directly adjacent;<br>• Designated monitoring wells shall be sampled quarterly for contaminants that were present;<br>• Water-level measurements in all designated wells and piezometers shall be made within 24-hour of initiating each sampling event.<br>*NOTE*: Monitoring parameters, frequency, sampling and analysis methods will be specified in CERCLA Remedial Action Work Plan. | Operation of an active remediation system – **Relevant and Appropriate** | F.A.C. 62-780.750(4)(a) through (c) |
| Florida active remediation regulation for groundwater bioremediation systems | Specifies that operational parameters for bioremediation systems should include measurements of dissolved oxygen at representative monitoring locations; rates of biological, chemical, or nutrient enhancement additions, an any other indicators of biological activity.<br><br>Conducted weekly for the first month, monthly for the next two months, and quarterly thereafter or at approved alternative frequency. | Operation of an active remediation system – **Relevant and Appropriate** | F.A.C. 62-780.700(11)(h) |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| | *NOTE*: Monitoring parameters, frequency, sampling and analysis methods will be specified in CERCLA Remedial Action Work Plan. | | |
| Florida active remediation regulation for groundwater in-situ systems | Specifies that operations parameters for in-situ systems should include measurements of biological, chemical, or physical indicators that will verify the radius of influence at representative monitoring locations.<br>Conducted weekly for the first month, monthly for the next two months, and quarterly for the first two years and semi-annually thereafter.<br>*NOTE*: Monitoring parameters, frequency, sampling and analysis methods will be specified in CERCLA Remedial Action Work Plan. | Operation of an active remediation system – **Relevant and Appropriate** | F.A.C. 62-780.700(11)(g) |
| Groundwater Monitoring for Monitored Natural Attenuation (MNA) remedy | A minimum of two monitoring wells is required[3]:<br>• At least one well shall be located at the downgradient edge of the plume; and<br>• At least one well shall be located in the area(s) of highest groundwater contamination or directly adjacent to it if the area of highest groundwater contamination is inaccessible (for example, under a structure). | Groundwater monitoring as part of the remedy relying on natural attenuation – **Relevant and Appropriate** | F.A.C. 62-780.690(8)(a) Natural Attenuation with Monitoring |
| | The designated monitoring wells shall be sampled for analyses of applicable contaminants no more frequent than quarterly. | Groundwater monitoring as part of the remedy relying on natural attenuation – **Relevant and Appropriate** | F.A.C. 62-780.690(8)(b) |
| | Water-level measurements in all designated wells and piezometers shall be made within 24 hours of initiating each sampling event. | Groundwater monitoring as part of the remedy relying on natural attenuation – **Relevant and Appropriate** | F.A.C. 62-780.690(8)(c) |
| ***Waste Characterization – Primary Waste (e.g., contaminated soil from well cuttings) and Secondary Wastes (e.g., contaminated equipment or purged ground water from wells)*** | | | |

[3] The designated number of wells, sampling time frames/frequency, and specific parameters for analyses will be provided in a Monitoring Plan that is included in a CERCLA post-ROD document prepared as part of the Remedial Design or Remedial Action which is approved by the EPA and the FDEP.

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Characterization of ***solid waste*** (all primary and secondary wastes) and listed hazardous waste determination | Must make an accurate determination as to whether that waste is a hazardous waste in order to ensure wastes are properly managed according to applicable RCRA regulations. A hazardous waste determination is made using the following steps:<br>(a) The hazardous waste determination for each solid waste must be made at the point of waste generation, before any dilution, mixing, or other alteration of the waste occurs, and at any time in the course of its management that it has, or may have, changed its properties as a result of exposure to the environment or other factors that may change the properties of the waste such that the RCRA classification of the waste may change.<br>(b) Must determine whether the waste is excluded from regulation under 40 CFR 261.4; and<br>(c) Must use the knowledge of the waste to determine whether waste meets any of the listing descriptions under subpart D of 40 CFR Part 261. Acceptable knowledge that may be used in making an accurate determination as to whether the waste is listed may include waste origin, composition, the process producing the waste, feedstock, and other reliable and relevant information. | Generation of solid waste as defined in 40 CFR 261.2 – **Applicable** | 40 CFR 262.11(a),(b) and (c)<br><br>F.A.C. 62-730.160 |
| Determination of characteristic hazardous waste | The person then must also determine whether the waste exhibits one or more hazardous characteristics as identified in subpart C of 40 CFR part 261 by following the procedures in paragraph (d)(1) or (2) of this section, or a combination of both. | Generation of solid waste which is not excluded under 40 CFR 261.4(a) – **Applicable** | 40 CFR 262.11(d)<br><br>F.A.C. 62-730.160 |
| Determination of characteristic hazardous waste through knowledge | The person must apply knowledge of the hazard characteristic of the waste in light of the materials or the processes used to generate the waste. Acceptable knowledge may include process knowledge (e.g., information about chemical feedstocks and other inputs to the production process); knowledge of products, by-products, and intermediates produced by the manufacturing process; chemical or physical characterization of wastes; information on the chemical and physical properties of the chemicals used or produced by the | | 40 CFR 262.11(d)(1)<br><br>F.A.C. 62-730.160 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| | process or otherwise contained in the waste; testing that illustrates the properties of the waste; or other reliable and relevant information about the properties of the waste or its constituents.<br>A test other than a test method set forth in subpart C of 40 CFR part 261, or an equivalent test method approved by the Administrator under 40 CFR 260.21, may be used as part of a person's knowledge to determine whether a solid waste exhibits a characteristic of hazardous waste. However, such tests do not, by themselves, provide definitive results. Persons testing their waste must obtain a representative sample of the waste for the testing, as defined at 40 CFR 260.10. | | |
| Determination of characteristic hazardous waste through testing | When available knowledge is inadequate to make an accurate determination, the person must test the waste according to the applicable methods set forth in subpart C of 40 CFR part 261 or according to an equivalent method approved by the Administrator under 40 CFR 260.21; or and in accordance with the following:<br>(i) Persons testing their waste must obtain a representative sample of the waste for the testing, as defined at 40 CFR 260.10.<br>(ii) Where a test method is specified in subpart C of 40 CFR part 261, the results of the regulatory test, when properly performed, are definitive for determining the regulatory status of the waste. | Generation of solid waste which is not excluded under 40 CFR 261.4(a) – **Applicable** | 40 CFR 262.11(d)(2)<br><br>F.A.C. 62-730.160 |
| | Must refer to Parts 261, 262, 264, 265, 266, 268, and 273 of Chapter 40 for possible exclusions or restrictions pertaining to management of the specific waste. | Generation of solid waste which is determined to be hazardous waste – **Applicable** | 40 CFR 262.11(e)<br><br>F.A.C. 62-730.160 |
| Identifying hazardous waste numbers for small and large quantity generators | Must identify all applicable EPA hazardous waste numbers (EPA hazardous waste codes) in subparts C and D of part 261 of this chapter. Prior to shipping the waste off site, the generator also must mark its containers with all applicable EPA hazardous waste numbers (EPA hazardous waste codes) according to § 262.32. | | 40 CFR 262.11(g)<br><br>F.A.C. 62-730.160 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| General Waste Analysis | Must obtain a detailed chemical and physical analysis on a representative sample of the waste(s), which at a minimum contains all the information that must be known to treat, store, or dispose of the waste in accordance with pertinent sections of 40 CFR 264 and 268. | Generation of RCRA hazardous waste or nonhazardous wastes if applicable under § 264.113(d) for storage, treatment or disposal – **Applicable** | 40 CFR 264.13(a)(1)<br><br>F.A.C. 62-730.180(1) |
| Special rules for characteristic hazardous waste | Must determine each EPA Hazardous Waste Number (waste code) applicable to the waste in order to determine the applicable treatment standards under subpart D of this part. This determination may be made concurrently with the hazardous waste determination required in § 262.11 of this chapter. For purposes of part 268, the waste will carry the waste code for any applicable listed waste (40 CFR part 261, subpart D). In addition, where the waste exhibits a characteristic, the waste will carry one or more of the characteristic waste codes (40 CFR part 261, subpart C), except when the treatment standard for the listed waste operates in lieu of the treatment standard for the characteristic waste, as specified in paragraph (b) of this section. | Generation of characteristic hazardous waste for storage, treatment or disposal – **Applicable** | 40 CFR 268.9(a)<br><br>F.A.C. 62-730.183 |
| | Must determine the underlying hazardous constituents [as defined in 40 CFR 268.2(i)] in the characteristic waste. | Generation of RCRA characteristic hazardous waste (and is not D001 nonwastewaters treated by CMBST, RORGS, or POLYM of § 268.42 Table 1) for storage, treatment or disposal – **Applicable** | 40 CFR 268.9(a)<br><br>F.A.C. 62-730.183 |
| Determinations for land disposal of hazardous waste | Must determine if the waste has to be treated before it can be land disposed. This is done by determining if the hazardous waste meets the treatment standards in §268.40, 268.45, or §268.49. This determination can be made concurrently with the hazardous waste determination required in §262.11 of this chapter, in either of two ways: testing the waste or using knowledge of the waste. If the generator tests the waste, testing would normally determine the total concentration of hazardous constituents, or the concentration of hazardous constituents in an extract of the waste obtained using test method 1311 in ''Test Methods of Evaluating Solid Waste, Physical/Chemical Methods,'' EPA Publication SW–846, (incorporated by reference, see §260.11 of this chapter), depending on whether the treatment standard for the waste is expressed as a total concentration or concentration of | Generation of hazardous waste for storage, treatment or disposal – **Applicable** | 40 CFR 268.7(a)<br><br>F.A.C. 62-730.183 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| | hazardous constituent in the waste's extract. (Alternatively, the generator must send the waste to a RCRA-permitted hazardous waste treatment facility, where the waste treatment facility must comply with the requirements of §264.13 of this chapter and paragraph (b) of this section.) | | |
| | Must comply with the special requirements of 40 CFR 268.9 in addition to any applicable requirements in CFR 268.7. | Generation of waste or soil that displays a hazardous characteristic of ignitability, corrosivity, reactivity, or toxicity for storage, treatment or disposal – **Applicable** | 40 CFR 268.7(a)<br><br>F.A.C. 62-730.183 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| ***Waste Storage – Primary Waste (e.g., contaminated soil from well cuttings) and Secondary Wastes (e.g., contaminated equipment, purged groundwater from wells)*** | | | |
| Temporary on–site accumulation of hazardous waste in containers | A small quantity generator may accumulate hazardous waste on site without a permit or interim status, and without complying with the requirements of parts 124, 264 through 267, and 270 of this chapter, or the notification requirements of section 3010 of RCRA, provided that all the substantive conditions for exemption listed in this section are met. | Accumulation of RCRA hazardous waste on site as defined in 40 CFR 260.10 – **Applicable** | 40 CFR 262.16(a)<br><br>F.A.C. 62-730.160 |
| Condition of containers | If a container holding hazardous waste is not in good condition, or if it begins to leak, the small quantity generator must immediately transfer the hazardous waste from this container to a container that is in good condition, or immediately manage the waste in some other way that complies with the conditions for exemption of this section. | | 40 CFR 262.16(b)(2)(i)<br><br>F.A.C. 62-730.160 |
| Compatibility of waste with container | Must use a container made of or lined with materials that will not react with, and are otherwise compatible with, the hazardous waste to be accumulated, so that the ability of the container to contain the waste is not impaired. | | 40 CFR 262.16(b)(2)(ii)<br><br>F.A.C. 62-730.160 |
| Management of containers | (A) A container holding hazardous waste must always be closed during accumulation, except when it is necessary to add or remove waste.<br>(B) A container holding hazardous waste must not be opened, handled, or accumulated in a manner that may rupture the container or cause it to leak. | | 40 CFR 262.16(b)(2)(iii)<br><br>F.A.C. 62-730.160 |
| Special conditions for accumulation of incompatible wastes | (A) Incompatible wastes, or incompatible wastes and materials, (see appendix V of part 265 for examples) must not be placed in the same container, unless § 265.17(b) of this chapter is complied with.<br>(B) Hazardous waste must not be placed in an unwashed container that previously held an incompatible waste or material (see appendix V of part 265 for examples), unless § 265.17(b) of this chapter is complied with.<br>(C) A container accumulating hazardous waste that is incompatible with any waste or other materials accumulated or stored nearby in other containers, piles, open tanks, or surface impoundments must be separated from the other | Accumulation of incompatible wastes, or incompatible wastes and materials on site – **Applicable** | 40 CFR 262.16(b)(2)(v)<br><br>F.A.C. 62-730.160 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| | materials or protected from them by means of a dike, berm, wall, or other device. | | |
| Labeling and marking of containers | A small quantity generator must mark or label its containers with the following:<br>(A) The words "Hazardous Waste";<br>(B) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704); and<br>(C) The date upon which each period of accumulation begins clearly visible for inspection on each container. | Accumulation of RCRA hazardous waste on site as defined in 40 CFR 260.10 **– Applicable** | 40 CFR 262.16(b)(6)(i)<br>F.A.C. 62-730.160 |
| Condition of container | If a container holding hazardous waste is not in good condition, or if it begins to leak, the owner or operator must transfer the hazardous waste from this container to a container that is in good condition, or manage the waste in some other way that complies with the requirements of this part. | Storage of RCRA hazardous waste in containers **– Applicable** | 40 CFR 265.171<br>F.A.C. 62-730.180(2) |
| Compatibility of waste with container | Must use a container made of or lined with materials which will not react with, and are otherwise compatible with, the hazardous waste to be stored, so that the ability of the container to contain the waste is not impaired. | | 40 CFR 265.172<br>F.A.C. 62-730.180(2) |
| Management of containers | Containers must be closed during storage, except when necessary to add/remove waste.<br>Container must not be opened, handled and stored in a manner that may rupture the container or cause it to leak. | | 40 CFR 265.173(a) and (b)<br>F.A.C. 62-730.180(2) |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Storage of hazardous waste in container area | Area must have a containment system designed and operated in accordance with 40 CFR 264.175(b) | Storage of RCRA hazardous waste in containers with *free liquids* – **Applicable** | 40 CFR 264.175(a)<br><br>F.A.C. 62-730.180(1) |
| | Area must be sloped or otherwise designed and operated to drain liquid resulting from precipitation, or<br>Containers must be elevated or otherwise protected from contact with accumulated liquid. | Storage of RCRA–hazardous waste in containers *that do not contain free liquids* (other than F020, F021, F022, F023, F026 and F027) – **Applicable** | 40 CFR 264.175(c)(1) and (2)<br><br>F.A.C. 62-730.180(1) |
| Closure of RCRA container storage unit | At closure, all hazardous waste and hazardous waste residues must be removed from the containment system. Remaining containers, liners, bases, and soils containing or contaminated with hazardous waste and hazardous waste residues must be decontaminated or removed.<br><br>[Comment: At closure, as throughout the operating period, unless the owner or operator can demonstrate in accordance with 40 CFR 261.3(d) of this chapter that the solid waste removed from the containment system is not a hazardous waste, the owner or operator becomes a generator of hazardous waste and must manage it in accordance with all applicable requirements of parts 262 through 266 of this chapter]. | Storage of RCRA hazardous waste in containers in a unit with a containment system – **Applicable** | 40 CFR 264.178<br><br>F.A.C. 62-730.180(1) |
| Closure performance standard for RCRA container storage unit | Must close the facility (e.g., container storage unit) in a manner that:<br>• minimizes the need for further maintenance;<br>• controls, minimizes or eliminates to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground or surface waters or the atmosphere; and<br>• complies with the closure requirements of subpart, but not limited to, the requirements of 40 CFR § 264.178 for containers. | Storage of RCRA hazardous waste in containers – **Applicable** | 40 CFR § 264.111 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Storage and processing of non-hazardous waste | No person shall store, process, or dispose of solid waste except as authorized at a permitted solid waste management facility or a facility exempt from permitting under this chapter.<br>No person shall store, process, or dispose of solid waste in a manner or location that causes air quality standards to be violated or water quality standards or criteria of receiving waters to be violated. | Management and storage of solid waste – **Applicable** | F.A.C. 62-701.300(1)(a) and (b) |
| ***Waste Treatment and Disposal – Primary Waste (e.g., contaminated soil from well cuttings) and Secondary Wastes (e.g., contaminated equipment, purged groundwater from wells)*** | | | |
| Disposal of RCRA *hazardous waste* in a land-based unit | May be land disposed if it meets the requirements in the table "Treatment Standards for Hazardous Waste" at 40 CFR 268.40 before land disposal. | Land disposal, as defined in 40 CFR 268.2, of restricted RCRA waste – **Applicable** | 40 CFR § 268.40(a)<br><br>F.A.C. 62-730.183 |
| | All underlying hazardous constituents [as defined in 40 CFR 268.2(i)] must meet the UTS, found in 40 CFR 268.48 Table UTS prior to land disposal. | Land disposal of restricted RCRA characteristic wastes (D001 –D043) that are not managed in a wastewater treatment system that is regulated under the CWA, that is CWA equivalent, or that is injected into a Class I nonhazardous injection well – **Applicable** | 40 CFR § 268.40(e)<br><br>F.A.C. 62-730.183 |
| Disposal of RCRA *hazardous waste soil* in a land-based unit | Must be treated according to the alternative treatment standards of 40 CFR 268.49(c) or according to the UTSs specified in 40 CFR 268.48 applicable to the listed and/or characteristic waste contaminating the soil prior to land disposal. | Land disposal, as defined in 40 CFR 268.2, of restricted hazardous soils – **Applicable** | 40 CFR § 268.49(b)<br><br>F.A.C. 62-730.183 |
| Constituents subject to treatment | When applying the soil treatment standards in paragraph (c) of this section, constituents subject to treatment are any constituents listed in § 268.48 Table UTS-Universal Treatment Standards that are reasonably expected to be present in any given volume of contaminated soil, except fluoride, selenium, sulfides, vanadium, zinc, and that are *present at concentrations greater than ten times the universal treatment standard*. PCBs are not constituent subject to treatment in any given volume of soil which exhibits the | | 40 CFR § 268.49(d)<br><br>F.A.C. 62-730.183 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| | toxicity characteristic solely because of the presence of metals. | | |
| Disposal of RCRA hazardous waste in a land-based unit | To determine whether a hazardous waste identified in this section exceeds the applicable treatment standards of 40 CFR 268.40, the initial generator must test a sample of the waste extract or the entire waste, depending on whether the treatment standards are expressed as concentration in the waste extract or waste, or the generator may use knowledge of the waste.<br><br>If the waste contains constituents (including UHCs in the characteristic wastes) in excess of the applicable UTS levels in 40 CFR 268.48, the waste is prohibited from land disposal, and all requirements of part 268 are applicable, except as otherwise specified. | Land disposal of RCRA toxicity characteristic wastes (D004 –D011) that are newly identified (i.e., wastes, soil, or debris identified by the TCLP but not the Extraction Procedure) – **Applicable** | 40 CFR § 268.34(f)<br><br>F.A.C. 62-730.183 |
| Disposal of RCRA characteristic wastewaters in a POTW | Are not prohibited, if wastes are treated for purposes of the pretreatment requirements of Section 307 of the CWA, unless the wastes are subject to a specified method of treatment other than DEACT in 40 CFR 268.40, or are D003 reactive cyanide. | Land disposal of hazardous wastewaters that are hazardous only because they exhibit a characteristic and are not otherwise prohibited under 40 CFR 268 – **Applicable** | 40 CFR 268.1(c)(4)(ii)<br><br>F.A.C. 62-730.183 |
| ***Waste Transportation – Primary and Secondary Wastes*** | | | |
| Transportation of hazardous waste *on–site* | The generator manifesting requirements of 40 CFR 262.20–262.32(b) do not apply. Generator or transporter must comply with the requirements set forth in 40 CFR 263.30 and 263.31 in the event of a discharge of hazardous waste on a private or public right–of–way. | Transportation of hazardous wastes on a public or private right–of–way within or along the border of contiguous property under the control of the same person, even if such contiguous property is divided by a public or private right–of–way – **Applicable** | 40 CFR § 262.20(f)<br><br>F.A.C. 62-730.160 |
| Transportation of hazardous waste *off–site* | Must comply with the generator standards of Part 262 including 40 CFR 262.20–23 for manifesting, Sect. 262.30 for packaging, Sect. 262.31 for labeling, Sect. 262.32 for marking, Sect. 262.33 for placarding, | Preparation and initiation of shipment of hazardous waste off–site – **Applicable** | 40 CFR § 262.10(h);<br>F.A.C. 62-730.160 |

| ACTION-SPECIFIC ARARs | | | |
|---|---|---|---|
| **Action** | **Requirement** | **Prerequisite** | **Citation** |
| Transportation of *hazardous materials* | Shall be subject to and must comply with all applicable provisions of the HMTA and HMR at 49 CFR 171–180 related to marking, labeling, placarding, packaging, emergency response, etc. | Any person who, under contract with a department or agency of the federal government, transports "in commerce," or causes to be transported or shipped, a hazardous material – **Applicable** | 49 CFR § 171.1(c) |
| Transportation of samples (i.e. contaminated soil or wastewaters) | Are not subject to any requirements of 40 CFR Parts 261 through 268 or 270 when:<br>• the sample is being transported to a laboratory for the purpose of testing; or<br>• the sample is being transported back to the sample collector after testing<br>• the sample is being stored by sample collector before transport to a lab for testing | Samples of solid waste or a sample of water, soil for purpose of conducting testing to determine its characteristics or composition – **Applicable** | 40 CFR § 261.4(d)(1)(i)–(iii)<br><br>F.A.C. 62-730.030 |
| | In order to qualify for the exemption in 40 CFR 261.4 (d)(1)(i) and (ii), a sample collector shipping samples to a laboratory must:<br>• Comply with U.S. DOT, U.S. Postal Service, or any other applicable shipping requirements.<br>• Assure that the information provided in (1) thru (5) of this section accompanies the sample.<br>• Package the sample so that it does not leak, spill, or vaporize from its packaging. | | 40 CFR § 261.4(d)(2)<br><br>40 CFR § 261.4(d)(2) (ii)(A) and (B)<br><br>F.A.C. 62-730.030 |

ARAR = applicable *or* relevant and appropriate requirement
CFR = Code of Federal Regulations
CWA = Clean Water Act
DOT = Department of Transportation
F.A.C. = Florida Administrative Code, Chapters as specified
F.S. = Florida Statutes
HMTA = Hazardous Materials Transportation Act
HMR = Hazardous Materials Regulations
ISEB = in-situ enhanced bioremediation
RCRA = Resource Conservation and Recovery Act
TBC = To be considered (guidance)
TCLP = toxicity characteristic leaching procedure
UHCs = underlying hazardous constituents
USDW = Underground Sources of Drinking Water
UTS = Universal Treatment Standards
VOC = volatile organic compound